■ ALANNA M., Appellant, v DUNCAN M., Respondent. [611 NYS2d 886] —In a matrimonial action in which the parties were divorced by judgment dated July 2, 1992, the plaintiff mother appeals, as limited by her brief, from so much of an order of the Supreme Court, Westchester County (Colabella, J.), dated August 4, 1993, as, after a hearing, granted sole custody of the parties' two children to the defendant father.

Ordered that the order is affirmed insofar as appealed from, without costs or disbursements.

In July of 1990, the parties entered into a separation agreement which provided for joint custody of their two children, with physical custody to the defendant father. In September of 1991, the plaintiff commenced this matrimonial action, although she did not seek custody of the children in her complaint. The defendant counterclaimed for sole custody of the children. The plaintiff then filed a reply in which she also sought sole custody of the children. After a hearing, the court issued a decision in which it found that both parents were fit, but concluded that the best interests of the children would be served by awarding custody to the defendant. The court stated that it had reached its determination after "intense scrutiny" of the parties and their respective witnesses over the course of the five-day hearing. We affirm.

The paramount consideration in making any award of custody is, of course, the best interests of the children involved (see, Friederwitzer v Friederwitzer, 55 NY2d 89; Matter of Sullivan v Sullivan, 190 AD2d 852; Matter of Ellen K. v John K., 186 AD2d 656). Since any custody determination depends to a very great extent upon the hearing court's assessment of the credibility of the witnesses and of the character, temperament, and sincerity of the parties (see, Matter of Irene O., 38 NY2d 776; Matter of Sullivan v Sullivan, supra), its findings "are generally accorded great respect * * * and will not be disturbed unless they lack a sound and substantial basis in the record" (Kuncman v Kuncman, 188 AD2d 517, 518).

While no agreement can bind the court to a particular disposition, the parties' own agreement as to who should have custody constitutes a "weighty factor", to which priority should be accorded absent extraordinary circumstances (Eschbach v Eschbach, 56 NY2d 167, 171; see also, Matter of Nehra v Uhlar, 43 NY2d 242, 251). Notably, "[t]his priority is afforded the first determination of custody in the belief [that] the stability this policy will assure in the child's life is in the child's best interests" (Eschbach v Eschbach, supra, at 171).

Here, after observing the parties and their witnesses' testify, and carefully reviewing all the relevant evidence, the court concluded that the children's interests would best be served by granting sole custody to the defendant, with whom the children had been residing for over 2½ years at the time the hearing was conducted, pursuant to an agreement executed by the parties themselves (see, *Matter of Krebsbach v Gallagher*, 181 AD2d 363; *Robert C. R. v Victoria R.*, 143 AD2d 262). It is true that the court chose to reject the recommendations of the court-appointed psychiatrist, Dr. Herbert Lessow, and the Law Guardian. However, the fact that an expert has been appointed does not require that the court accept the opinion of that expert (see, *State of New York ex rel. H.K. v M.S.*, 187 AD2d 50, 53). We note that neither Dr. Lessow nor the Law Guardian concluded that the defendant was materially less fit as a parent; indeed, Dr. Lessow described the question of who should be awarded custody a relatively even call and characterized both parents as "highly devoted" parents. As the trier of fact reviewing the entire record, the court was free to reject Dr. Lessow's custody recommendation and credit the evidence favoring the defendant's retention of custody, including, among other things, the parties' pre-existing agreement with respect to custody, the defendant's prior role as successful custodian of the children, his motivation and desire to continue in that role, his ability to be with the children on a full-time basis due to his retirement on a disability pension, and his stable home environment.

Contrary to the dissenter's suggestions, Dr. Lessow's written report contains no conclusion or finding that the defendant was abusive, meted out excessive corporal punishment, or engaged in any improper physical conduct with regard to the parties' son Michael. Nor is there anything in Dr. Lessow's report which establishes that the defendant's parenting style was responsible for Michael's sensitive personality—which Dr. Lessow described, *inter alia*, as a "possibly congenital personality structure". Rather, Dr. Lessow's written custody recommendation was largely premised upon his perception that the defendant's more direct, "no-nonsense" style of parenting might be less compatible with the sensitive nature of Michael's personality. However, in light of Dr. Lessow's own description of the parties' relationship as "dysfunctional", and his conclusion that the parties' acrimonious relationship has impacted negatively upon Michael, the court could reasonably have concluded, as it did, that Michael's problems were "a natural response to the divorce of his parents".

Although the dissent takes issue with the court's finding that the plaintiff acted in bad faith when she filed child abuse charges against the defendant based on his alleged pulling of Michael's hair, the fact remains that the Child Protective Services Agency investigated the plaintiff's complaint of "excessive corporal punishment" at length and found it to be unfounded. We note in this respect that the alleged incidents mentioned in the plaintiff's complaint apparently occurred when the parties were living together prior to April 1990 but were not reported by the plaintiff until June of 1991, after she had left the children in the defendant's custody, and shortly before she commenced the instant action. Further, it appears that the plaintiff and her boyfriend, with whom she was living, both filed child abuse complaints against their respective spouses at approximately the same time, i.e., in mid-1991. Additionally, while the dissent recites the mother's claim that she had been subjected to "years of physical and psychological abuse", there was no such finding made by any of the examining experts in their written reports, nor was any such alleged conduct mentioned in their written assessments bearing upon the issue of custody. We note in this regard that despite the plaintiff's allegations with respect to the defendant's conduct, she nevertheless voluntarily consented to his retention of physical custody when she left the marital home and later, did not include in her complaint a cause of action for divorce based on the grounds of cruel and inhuman treatment.

In short, there is nothing in the record which establishes that the defendant is unfit to assume the role as sole custodial parent.

Accordingly, and upon our review of the entire record, we cannot say that the court's decision to award the defendant sole custody constituted an improvident exercise of discretion. Thompson, J. P., Rosenblatt and Ritter, JJ., concur.

Miller, J., dissents and votes to reverse the order insofar as appealed from, and to grant custody to the plaintiff mother, with the following memorandum: I do not agree with the conclusion of the majority that the custody determination of the Supreme Court is supported by a sound and substantial basis in the record. Rather, I find that the evidence adduced at the trial greatly preponderates in favor of a finding that the children's best interests would be served by a transfer of custody to the mother, and that the court's findings are not supported by the record. While I stand alone as a sole dissenter, my views are shared unanimously by the court-appointed child psychiatrist, Michael's therapist, the Law Guardian, and

Michael. As the majority correctly states, courts are not required to accept the opinions of experts. However, neither are they free to disregard them arbitrarily. A rational explanation must be required (see, *Matter of Krebsbach v Gallagher*, 181 AD2d 363, 365; *Matter of Harvey v Share*, 119 AD2d 823, 824; *Zelnik v Zelnik*, NYLJ, Feb. 10, 1993, at 22, col 1, *affd* 196 AD2d 700). In my view, none is forthcoming in this case because the court's determination to grant custody to the father in the children's best interest is unsupportable by any fair interpretation of the record (see, *Matter of Rebecca B.*, 204 AD2d 57).

Custody determinations based upon the court's assessment of the best interest of the child (see, *Friederwitzer v Friederwitzer*, 55 NY2d 89, 95; *Matter of Sullivan v Sullivan*, 190 AD2d 852; *Matter of Ellen K. v John K.*, 186 AD2d 656) depend to a very great extent upon the hearing court's assessment of the credibility of the witnesses and of the character, temperament, and sincerity of the parties (see, *Matter of Irene O.*, 38 NY2d 776; *Matter of Sullivan v Sullivan, supra*). However, notwithstanding the great respect that the court's findings are generally accorded, appellate courts may not allow a custody determination to stand where it lacks a sound and substantial basis in the record (see, *Matter of Coyne v Coyne*, 150 AD2d 573; *Skolnick v Skolnick*, 142 AD2d 570).

I shall demonstrate hereafter that this record strongly supports reversal and an award of custody to the mother.

BACKGROUND:

Alanna and Duncan M. were married in 1983 after having lived together for several years. In 1990, when Michael was 5 and Jillian was 2, Alanna moved out of the marital residence, leaving the children with their father, who had retired from the police department due to a back injury. A written separation agreement executed in July 1990 provided that the parties would share joint custody, but that Duncan would have physical custody of the children in the marital home. Significantly (although not noted by the majority), the agreement also provided that the residence of the children may be changed to Alanna's residence at a future time based upon changed circumstances and considering the needs and desires of the children, and was therefore intended to be temporary.

Alanna explained that she left the children with their father because she had "nowhere else to leave them", that Duncan was receiving employment disability benefits and was not then working, and was therefore able to care for them,

and that she felt compelled to leave the marital home as a result of many years of physical and emotional abuse. In September 1991, about one and one-half years later, having established a new home and a personal relationship with a person whom she subsequently married, Alanna commenced the instant matrimonial action. Her complaint initially sought only a conversion divorce. When Duncan counterclaimed for sole custody, she requested sole custody in her reply. An inference is drawn by the majority that Alanna's leaving the household, while temporarily permitting the children to remain with their father, implies a lack of sincerity in her subsequent efforts to regain custody. However, this fails to recognize the all-too-common plight of financially insecure women seeking to extricate themselves and their children from controlling, abusive environments, who are often found to make interim, less than optimal, arrangements.

## The Court's Decision

The trial court relied on four factors in support of its determination that an award of custody to the father would be in the children's best interest: (1) the court's assessment of the parties' character, temperament, and credibility, (2) the need for stability, (3) the plaintiff's actions, and (4) the advisory nature of the experts' opinions and the child's wishes. The court indicated that the "primary factor" upon which its finding was based was its assessment of the parties' character and credibility.

### THE PARTIES' CHARACTER, TEMPERAMENT, AND CREDITILITY, AND THE PLAINTIFF'S ACTIONS

Alanna was found to be "manipulative, disingenuous, and calculating", whereas Duncan was "honest and forthright". The court's negative assessment of Alanna's character was greatly influenced by the fact that she filed child abuse charges which were ultimately determined to be "unfounded" by the Child Protective Services Agency. "Most importantly, the court finds the plaintiff's actions in respect to the specious child abuse charges she filed to be reprehensible and by itself sufficient to support awarding full custody to the defendant * * * This strategic and malicious plot to undermine the [father's] position as custodian cannot and will not be tolerated by the court". The court then proceeded to find: "absolutely no shred of evidence to any of plaintiff's abuse allegations as to her depiction of Michael's fear of his father".

In 1991 Alanna called the Child Protective Services Agency (hereinafter CPSA) when she noticed a big patch of hair missing from Michael's head, and Michael reported that his father had pulled it out. As a result of that charge, CPSA

investigated the incident, and ultimately determined that an abuse case was "unfounded", but arranged for family therapy, and a mandated prevention case was opened. The fact that CPSA considered the charges insufficient to constitute excessive corporeal punishment does not, however, equate with a conclusion that they were specious or made in bad faith (see, Matter of Augustine v Berger, 88 Misc 2d 487; see also, Cooper v Wiley, 128 AD2d 455).

The record is replete with evidence substantiating Alanna's claim that Duncan pulled Michael by the hair as a manner of disciplining him. Duncan himself admitted at trial and to various health professionals that he had pulled Michael's hair. Dr. Lessow, the court-appointed psychiatrist who interviewed the entire family, testified that Michael told him that his father smacked him across the face, squeezed his arm, and pulled his hair. The child's therapist, David Wall, testified that Michael told him of a hair-pulling incident in March 1992 and at a boy scout function, that his father pulled him by his hair several times and that he had picked him up by the hair, resulting in hair loss.

Similarly contradicted by the record is the court's finding of "absolutely no shred of evidence to any of the plaintiff's abuse allegations as to the (mother's) depiction of Michael's fear of his father". Dr. Lessow found "Michael is clearly unfortunately fearful and frightened of his father". The child's therapist testified that he was afraid of his father and that he reported that his father yelled at him and slapped him. Both therapists observed Michael's anxious manner in his father's presence. The children's Law Guardian described Michael as a "sensitive, anxious, and fearful child". Based on the record, the court's finding that not a "scintilla" of evidence of Michael's fear was established is inexplicable.

Strikingly absent from both the court's decision and the majority opinion is any concern regarding Michael's fear of his father or of the specific hair-pulling incidents. My colleagues are apparently not impressed by Michael's fears, and are satisfied by the fact that Dr. Lessow did not characterize Duncan's conduct as "abusive" or "excessive corporeal conduct". They are also apparently willing to accept the trial court's "diagnosis" of the child's fear of his father as no more than a "natural response to the divorce of his parents". Surprisingly, the majority makes no reference to Dr. Lessow's unqualified and unambiguous recommendation that Michael's best emotional interest would be served by living with his mother, and that he is "unfortunately fearful and frightened"

of his father, with whom he had lived for the past two and one-half years.

Indeed, Michael's fear of his father is not inexplicable in light of other evidence in the record bearing on Duncan's difficulty in controlling his anger.

Alanna's testimony of suffering years of physical and emotional abuse did not, as the majority observed, result in a finding of abuse by any of the examining experts in their written reports. Although this circumstance is readily explained by the fact that custody of the children rather than spousal abuse was the issue before the court, direct evidence of Duncan's abusiveness is nonetheless contained in the record, since he admitted to Dr. Lessow that he had hit Alanna twice, and that he also hit a waitress who had "plucked [him] in the head" after he had taken a french fry from her tray. Duncan's therapist, Dr. Freeman, testified that he was being treated for "anger management". Duncan had been suspended from the police force for a disciplinary problem. Duncan's childhood memory of punishment by his father (a Sing Sing guard who abused alcohol) may explain his method of disciplining Michael. Duncan recalled, "he hit me when I needed it".

STABILITY

The court correctly states that stability is an influential factor in determining custody and that if modification of an existing custodial arrangement is sought, priority should be accorded to the original arrangement in the interest of stability and the child's best interest (see, Matter of Nehra v Uhlar, 43 NY2d 242; Eschbach v Eschbach, 56 NY2d 167). However, the court failed to take into consideration other significant factors that must be considered in addition to stability in determining the children's best interest, including the children's emotional needs. Moreover, since in this case, the existing custodial arrangement is by virtue of a separation agreement rather than a plenary trial, it is entitled to less deference (see, Friederwitzer v Friederwitzer, 55 NY2d 89, 95, supra; Matter of Patsy M.C. v Lorna W.C., 165 AD2d 813).

Furthermore, as indicated above, the living arrangement in this case, provided for in the separation agreement, was of a temporary nature, since it provides for and contemplates a possible change in the children's residence to the mother's home after considering the "needs and desires" of the children. Also mitigating any negative effects of re-arranging the children's custodial arrangement is the fact that the children have been at their mother's home every other weekend, holidays, and every Monday and Tuesday. Alanna has been

intimately involved in all aspects of their lives. Therefore, a transfer of residence to her would not be disruptive, particularly if made at the end of the school year, as the Law Guardian recommended.

REJECTION OF EXPERTS RECOMMENDATIONS AND CHILD'S PREFERENCE

As observed herein, while opinions of court-appointed experts are not necessarily determinative of the court's ultimate finding (see, State of New York ex rel. H.K. v M.S., 187 AD2d 50, 53), their rejection may not be arbitrary, and must be explained (see, Matter of Krebsbach v Gallagher, 181 AD2d 363, supra; Matter of Harvey v Share, 119 AD2d 823, supra; Zelnik v Zelnik, NYLJ, Feb. 10, 1993, at 22, col 1, affd 196 AD2d 700, supra). In rejecting the recommendation of Dr. Lessow, the court-appointed psychiatrist, the court found it was predicated on an "insufficient factual basis", but provided no inkling whatsoever as to what evidence the psychiatrist failed to consider. Indeed, a review of Dr. Lessow's report, consisting of 15 pages, including psychiatric and diagnostic evaluations of Duncan, Alanna, Richard P. (Alanna's new husband), Debby Yaciuk (Duncan's "significant other"), Elizabeth M. (Duncan's daughter of his prior marriage), and the children, as well as telephone contacts with other therapists, is impressive in its thoroughness, detail, and seemingly evenhanded evaluation of all the parties. Finding both parents "highly devoted" and seeking "a very meaningful role" in the lives of their children, Dr. Lessow found a change in residence warranted and that the best interest of the children would be served by living with their mother.

Clearly significant to the doctor's conclusion as to the best interest of the children is his impression of Michael as a "depressed, fearful, worried, and confused child". "His troubled emotions seem to have affected his attention span in school as well as his performance. One suspects that this is a child who would be achieving more if he were more emotionally stabilized". Based primarily on Alanna's "better bonded emotional relationship to her children" and the consideration that Michael "is clearly unfortunately fearful and frightened of his father", the doctor concluded that "his best emotional interests would be served by living with his mother".

Similarly, the recommendation of the Law Guardian was disregarded by the court. Her report indicated that she had interviewed the children on several occasions, alone and in the company of each of their parents, met with the parents individually, and with the father's daughter of his first marriage, and had numerous conversations with Michael's thera-

pist, and the Child Protective Services Agency worker, and the school social worker. The Law Guardian recommended that Alanna be granted custody and that the change of custody take place at the end of the school year, concluding that Alanna is "temperamentally better suited to parent the children, Michael in particular. She is more responsive and less critical of his sensitivity. She is a warm and affectionate person who has remained continually involved with all aspects of the children's lives. She has an appropriate home and is now married to a man who seems to have a good relationship with her children. The children would get more individual attention in her home because they would be the only children residing there * * * She does not have the need to control and would likely be more flexible and accommodating regarding visitation for the sake of the children. This is a factor that will be crucial to the children's adjustment". In rejecting the Law Guardian's recommendation, the court stated the recommendation had been "a difficult decision for the Law Guardian". However, nothing in the record or the Law Guardian's report supports that observation.

The court also rejected the preference of 8-year old Michael to reside with his mother, stating, "The court believes there is a strong possibility the children are being momentarily influenced by the plaintiff and her new life (new house, new pool, etc.), and thus deems it not ultimately in their best interest to move in with the plaintiff." While the wishes of a young child are clearly not controlling on a court's determination of custody, they are entitled to careful and significant consideration (see, Koppenhoefer v Koppenhoefer, 159 AD2d 113). The record in this case provides not a scintilla of evidence in support of the court's purely speculative conclusion that Michael's preference was inspired by his interest in the new amenities of his mother's home.

The three professionals who urged the court to award custody to the mother and with whom the court disagreed, represent three distinct disciplines and perspectives. The court-appointed child psychologist was selected by virtue of his objectivity and expertise, to aid the court in providing psychological insight into the children's needs and the parties' attributes. The Law Guardian was specially trained to represent to the court the needs, concerns, and preferences of the children, as well as to present relevant evidence bearing on those factors affecting the court's custody determination. Michael's therapist was privy to the child's emotional condition on the most intimate level. Their investment in time, expense,

and professional expertise was substantial. The court may have reason to disagree with any or all of their opinions. They may have failed to consider certain factors, lacked objectivity, failed to devote sufficient time, or lacked expertise. However, since in this case the court provided no cogent reasons for rejecting any or all of the experts' opinions, we must infer either they do not exist or cannot be articulated.

BEST INTEREST OF THE CHILDREN

In considering questions of child custody, the best interests of the child are paramount (see, Eschbach v Eschbach, 56 NY2d 167, 171, supra). "Among the factors to be considered are the quality of the home environment * * * the parental guidance the custodial parent provides for the child * * * the ability of each parent to provide for the child's emotional and intellectual development * * * the financial status and ability of each parent to provide for the child * * * the relative fitness of the respective parents, and the length of time the present custody arrangement had been in effect" (Matter of Krebsbach v Gallagher, 181 AD2d 363, 364, supra).

Both parents herein offer an acceptable home environment, adequate parental guidance, and adequate financial support, and neither has been found "unfit". Although the children have resided with their father for two years, their mother has had on-going intimate participation in their lives and they have spent substantial and consistent periods of time in her home. Thus, a change in their living circumstances will not substantially affect their stability.

Moreover, both the Law Guardian and Dr. Lessow opined that Alanna would be the more flexible and amenable to provide uninterrupted access and visitation by Duncan. Indeed, although the court credited Duncan's testimony that Alanna interfered with visitation, Duncan admitted that often when she arrived to pick up the children they were produced late. Duncan's daughter testified that Alanna had difficulty when calling to speak to the children on the telephone and that she herself failed to tell the children that the mother had called. She further admitted, that at least on one occasion, she knew the children were away for the weekend at Duncan's friends home, but did not reveal to the mother where they were. A workable visitation schedule that would be complied with is of great importance to the children's healthy development, and would be best assured by giving Alanna custody.

In sum, the record so overwhelmingly supports the conclusion that it would be in the children's best interest for their custody to be transferred to their mother that I must dissent.