*460 OPINION OF THE COURT
Paul I. Marx, J.
On August 16, 2012, this court had the privilege of meeting twins, WC. and J.C., and M.C. at a Lincoln hearing[1] in furtherance of this court’s quest to determine the best interests of the children so as to render a custody decision as part of the parties’ impending divorce. The Lincoln hearing marked the culmination of the custody portion of the trial. This decision and order is intended to resolve the parties’ dispute concerning custody of, and parental access to, the children.
It is important to note that, as this court informed the children, they are in the enviable position of having two very capable, loving and doting parents. This court has no doubt that whatever decision is rendered, the children (who are mature beyond their years, intelligent, poised and well spoken) will continue to thrive. Nevertheless, because the parties cannot agree on parental access and custody issues, this decision and order has become necessary.
The matter was tried to this court on March 21 and 22, May 2, June 21 and August 15, 2012. Plaintiff was represented by Sheila Callahan O’Donnell, Esq.; defendant was represented by William Larkin, III, Esq.; and the children were represented by Martin R Goldberg, Esq. Both parties testified at trial, as did Marc S. Mednick, Ph.D., a forensic psychologist whose report was admitted into evidence pursuant to Uniform Rules for Trial Courts (22 NYCRR) § 202.16 (g) (2) on plaintiffs case. Dr. Med-nick also testified in court and was cross-examined on defendant’s case. Kathleen W. and Kim W, who were previously employed by the parties as mother’s helpers, testified on plaintiffs case. Mary C., the children’s paternal grandmother, and Christine C., defendant’s girlfriend, testified on defendant’s case.
Procedural History
The parties were married in 1996. Plaintiff filed this action for divorce in 2009. The parties began living separate and apart in 2009. As noted above, they have three children who are the subject of this order, W, J. and M.
Central to the dispute is the plaintiffs reasonable and understandable desire to have access to the children on weekends during the school year; something she has been deprived of for *461 nearly three years (except when defendant agreed) as a result of what was intended to be a temporary order issued by the Honorable David Ritter (Justice of the Supreme Court, retired) on September 1, 2009. In the main, the Ritter order awarded custody of the children on weekdays to their mother and on weekends to their father. This decision and order is designed to replace the Ritter order.
The Parties’ Positions
In their proposed dispositions, at trial and in their posttrial letter submissions, each party requests the court to decide custody differently.
The court appointed forensic evaluator, Marc S. Mednick, Ph.D., observed in his June 11, 2011 report that “the children benefit from the active engagement of both parents.” He notes that “[t]hey could well tolerate, and benefit from, a custodial plan that approximated a split in time between the parties.” While he notes that this “might not be practical to do . . . the limits here have more to do with logistics, and Mr. C.’s availability” because it “is not at all clear . . . that he could make himself available enough for a 50-50 split in time to work.” He recommends, “at a minimum, they need an alternate weekend, from Thursday to Monday, with at least one midweek overnight on the alternate week.” He adds that “W would benefit from at least one additional day with his father, and the girls would have that evening with their mom.” Finally, he notes that “[i]f Mr. [C.] could adjust his schedule to be home more, that would benefit the children. [Similarly,] if they could experience their mother shifting to a work role, even part time, she could model career relevant behavior to the children.”
Through her counsel, Mrs. C. urges that,
“[g]iven the fact that Mrs. C. has been a superlative mother, has encouraged and strengthened the children’s relationship with their father at all times, has never interfered with the father’s access with [sic] their children, and was willing to accede to a very liberal access schedule (even though that access schedule involved the grandparents because the father is not available) that she should be granted sole physical custody of the children”; “Mr. [C.] should be given the access schedule that his hand picked evaluator suggested as a schedule.” (Post-trial submission of Ms. O’Donnell dated Sept. 26, 2012.)
*462 In essence, she asserts that Mr. C.’s employment obligations preclude this court’s ability to award custody of any significant duration to him.
Mr. C.’s counsel, not surprisingly, urges a different custody arrangement. “Both the children and Dr. Mednick have requested and recommended that [there should be] a shared custodial arrangement.”
“[Jjoint legal and physical custody should continue with the parties sharing time with the children alternating weeks from Friday after school to the following Friday. With an alternating schedule, there is no need for a different summer vacation schedule. The parties shall alternate the major holidays, Father’s Day shall be spent with the Father, Mother’s Day shall be spent with the Mother, and both parties shall have access to the children on the children’s birthdays.” (Posttrial submission of Mr. Larkin dated Sept. 26, 2012.)
Mr. Goldberg, the Attorney for the Children, suggests that the court award “joint legal custody and joint physical custody with the children alternating with each parent on a one week on and one week off basis.” (Posttrial submission of Mr. Goldberg dated Sept. 10, 2012.)
Discussion/Analysis
In deciding questions of custody, the court must determine what is in the children’s best interests and what will best promote the children’s welfare and happiness. (Eschbach v Eschbach, 56 NY2d 167 [1982].) The paramount concern in a custody dispute is to determine the best interests of the children based on a consideration of all the relevant facts and circumstances. (Id.)
Factors for the court to consider in determining what is in the children’s best interests include: the quality of the home environment and the parental guidance the custodial parent provides for the children; the ability of each parent to provide for the children’s emotional and intellectual development; the financial status and ability of each parent to provide for the child; the relative fitness of the parents; and the length of time the present custody arrangement has been in effect. (Matter of Bowe v Robinson, 23 AD3d 555, 556 [2d Dept 2005].)
Although neither party suggested separating the children from each other, “[t]he stability and companionship to be gained from keeping children together is . . .an important factor for a *463 court to consider” in deciding custody. (Id.) “Close familial relationships are much to be encouraged. Young brothers and sisters need each other’s strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful.” (Eschbach, 56 NY2d at 173 [internal quotation marks and citation omitted].) While the express wishes of the children are not controlling in determining whether to modify custody, they are entitled to great weight, after consideration of the age and maturity of the children and the potential for influence having been exerted on the children. (Id.; Bowe, 23 AD3d at 557; Friederwitzer v Friederwitzer, 55 NY2d 89, 94 [1982].)
The parent’s ability to place the children’s needs above his or her own in fostering a continued relationship with the noncustodial parent is another important consideration for the court to consider. (Lohmiller v Lohmiller, 140 AD2d 497 [2d Dept 1988]; Janecka v Franklin, 150 AD2d 755, 756 [2d Dept 1989].)
The role of the court-appointed forensic expert in custody matters is to offer guidance and inform — with the ultimate determination on custody being a judicial function, not one for the expert. (Matter of John A. v Bridget M., 16 AD3d 324, 332 [1st Dept 2005, Sullivan, J., concurring].) The fact that an expert has been appointed by the court does not require the court to accept the expert’s opinion. (Alanna M. v Duncan M., 204 AD2d 409 [2d Dept 1994].) The recommendations of court-appointed forensic experts are but one factor for the court to use in deciding custody and are entitled to some weight. (Neuman v Neuman, 19 AD3d 383, 384 [2d Dept 2005].) “However, they are not determinative and do not usurp the judgment of the trial judge.” (Id.)
“Moreover, a court should be mindful that ‘the existence or absence of any one factor cannot be determinative on appellate review since the court is to consider the totality of the circumstances.’ ” (Bowe, 23 AD3d at 557.)
This court believes that the primary reason why these parties could not reach an agreement concerning the custody of the children was, as described by Dr. Mednick, Mrs. C.’s inability or refusal to “grasp fully the centrality of Mr. C. in the children’s lives”; “[s]he views his contact with them, and his importance, as somewhat peripheral relative to her own contribution.” In other words, she does not recognize that anyone other than herself should/could play a central role in the raising or develop *464 ment of the children; be it the children’s father or their grandparents. Compounding matters was Mrs. C.’s belief that Mr. C. could not balance his work schedule with any substantial parenting role. She insists that because of his employment in New York City, he cannot be at home with the children and that, therefore, they will be warehoused with Mr. C.’s mother. She believes that if the children are not with Mr. C., they should be with her and no one else. This court does not agree. The best interests of children are not dictated nor determined by which parent has the most free time and is most readily available to the children 24 hours per day, seven days per week. Children of these ages do not require a helicopter parent, present at all times, ready to swoop in at the slightest inkling of a problem. Children grow, in part, by problem solving.
Mr. C. is in the enviable position, as testified by him and found by me to be credible, of being able to dictate his own schedule. The custody arrangement set forth below will enhance his ability to plan his business travels on days when he does not have custody of the children. Furthermore, it was apparent that the children are delighted by and enjoy the company of their grandparents; referring to time spent with Mr. C.’s mother as time at “Camp Grandma.” Indeed, having had the opportunity to observe and listen to her, this court could scarcely envision a grandmother more suitable to help raise the children than the senior Mrs. C. Contrary to plaintiffs contention, defendant has not sought to transform this case into a “grandparent case.” Rather, the extent of the senior Mrs. C.’s involvement with the children became an issue in part because of plaintiffs objection to her participation in school related activities and in part because of plaintiffs objection to what she contends is defendant’s warehousing of the children with his mother. The children’s love and respect for their grandmother was nearly palpable during my visit with them; almost as much as their love and respect for both of their parents. This fact, the children’s unabashed delight in spending time with their grandmother, cannot be ignored. Nor should the fact that the children unanimously voiced their desire and pleasure at having time with both parents equally. Indeed, despite their young ages, the children all recognized that each parent has different strengths and aptitudes to offer them. Plaintiffs counsel’s criticism of the senior Mrs. C., and her suggestion that the court charge itself with a missing witness charge as to the senior Mr. C., notwithstanding, the best interests of the children would be *465 enhanced by their having access to their grandparents. However, Mr. C. is urged to have his parents, and in particular, his father, to whom unfair criticism of Mrs. C. is ascribed by Dr. Mednick, relent in their criticism of Mrs. C. Mrs. C. did not present to the court as a “gold-digger,” “primarily motivated by money”; two statements attributed to the senior Mr. C. If, indeed, the senior Mr. C. reported such to Dr. Mednick, he should be disabused of that notion. Such an opinion would appear to be incorrect, is contradicted by the evidence heard by this court, and in any event, is contrary to the children’s development and best interests.
Unfortunately, at times, the trial degenerated into a contest of which party spent more (or less) time at home raising the children when they were infants. Thus, there was extensive testimony and cross-examination regarding both parties’ work schedules while the children were infants as well as the testimony from the mother’s helpers. The testimony concerning the amount of time each party was able to devote to the then infant children is, in this court’s view, barely relevant given the children’s current ages, their obvious ability to dress, bathe and toilet themselves, and their obvious intelligence and maturity.
Ironically, Mrs. C.’s counsel seemed intent on criticizing Mr. C. for devoting long hours to becoming a financial success and working hard; yet it is his diligence and success that has allowed this family (both before and after separation) to live such a comfortable lifestyle. This court will not hold it against Mr. C. that he has dedicated a significant portion of his life to earning sufficient monies to provide for his family. Indeed, it is his very success that will allow the custody arrangement set forth below to succeed. From his efforts the parties will be able to establish two households where the children can live and continue to grow successfully without acting or feeling like vagabonds required to carry their belongings from home to home.
The court notes that Mrs. C. was so singularly minded in her purpose that she was often evasive in responding to questions asked by opposing counsel; at times feigning an inability to understand even the most simple questions. Whether this was deliberate or not could not be discerned, but the court also notes that when the court asked a similar question to that being posed by counsel, a responsive answer was forthcoming. While perhaps noble in her mind, borne of her desire to do that which she felt best served her children, the evasiveness unnecessarily extended the proceedings and obscured, rather than *466 enhanced the court’s ability to discern what really mattered— the best interests of the children. This observation is not meant to imply that Mrs. C. was not credible; simply that she sometimes lost focus of the forest for the trees. Nevertheless, the court has no doubt that, as each of the children noted, she is a very good mother. Perhaps this decision will allow her to recognize that she should not and cannot elevate her need or desire to “be there for the children” above the children’s actual needs. As noted by Dr. Mednick, if Mrs. C. were to secure employment, she could reinforce her position as a positive role model; especially for her daughters, M. and J.
By contrast, Mr. C.’s testimony lacked any coloring, evasiveness or shading. He readily admitted that he works long hours at times and that he is required to travel on business fairly regularly, both domestically and internationally. He acknowledged that he is driven; yet assures the court, and the court accepts as true his assurances, that he can and will modify his schedule to accommodate his children’s parenting needs. This court is relying on his assurances.
Notably, while Mr. C.’s girlfriend testified at the trial, Mrs. C.’s boyfriend did not. As a result, the court was not able to evaluate the impact of both party’s significant other on the children. However, the children advised the court that they enjoy the company of both Mr. C.’s girlfriend and her children immensely and it was obvious from her testimony that Mr. C.’s girlfriend is extremely fond of the children and that they have developed positive relationships, free of jealousy or animosity. The custody arrangement set forth herein should enhance those relationships, which should provide an additional positive role model for the girls. The fact of the matter is that, assuming a continuation of Mr. C.’s relationship with his girlfriend, she will not and cannot replace Mrs. C.’s place with the children. Nevertheless, her presence can, and does, in this court’s view provide an additional opportunity for the children to see a relationship work well. That Mr. C.’s girlfriend has children of roughly the same age as W, J. and M. simply delights the children who spoke glowingly of their friendships with her children. Hopefully, the children will develop a similar relationship with Mrs. C.’s boyfriend, who each child described in positive terms as well.
This Court’s Decision
This court has carefully considered the testimony, character, and sincerity of the parties, who were subject to vigorous direct and cross-examination, as well as the evidence admitted during *467 the trial. Considering the totality of the circumstances, the court finds that the best interests of the children would be served by the parties sharing legal custody (such that all significant decisions pertaining to their physical well-being and education will be made jointly), and for physical custody to be shared by the parties alternating weeks with each parent having the children reside with them one week on and one week off. Indeed, this is the arrangement which has been in place for nearly three summers. Since there has been little grousing about this arrangement during the period of time that this matter has been assigned to me, I conclude that it works well.[2] Each parent will be responsible for transportation to and from school and extracurricular and social events during the week(s) he/she has custody.
Further, the parties are to alternate major holidays during each year with them reversing the holiday schedule in each subsequent year. Mr. C. shall have the children on Father’s Day and his birthday and Mrs. C. shall have the children on Mother’s Day and her birthday regardless of which parent would otherwise have the children according to the week on and week off schedule. Both parents shall have access to the children on the children’s birthdays; the one with physical custody being afforded the first choice of whether he/she wishes to have the child(ren) the morning of the birthday or the evening.[3] In the event that the parties cannot agree to a time for the other to see the child(ren) on his/her/their birthdays, then the child(ren) shall be delivered to the other no later than 3:00 p.m. on the birthday and returned no later than 8:00 p.m. Whatever arrangement is made for the first birthday that follows this decision shall apply to all other birthdays which follow.
Both parties shall be and hereby are afforded unfettered access to the medical, dental, school and other records pertaining to the children. Each parent is to immediately advise the other in the event a medical need, routine or emergent, arises. In the event that a child takes ill for a period in excess of 48 hours, both parents shall have access to the child regardless of which parent then enjoys physical custody. Similarly, in the event a *468 child is hospitalized for any reason, both parents shall have the right to visit with the child at any place where the child might then be confined; subject only to the rules and regulations of the institution where the child is confined and the best interest of the child as determined by his/her treating physician.
Each parent shall notify the other of such events as PTA meetings, parent-teacher conferences and the like. In the event a child brings home a bulletin or other announcement from, or relating to, their school or extracurricular activities, each parent shall forward a copy of such item to the other sufficiently in advance of any scheduled event, but in no event later than 48 hours after receipt, so that the other may, if so advised, attend or participate in the event or activity. Verbal announcements shall be shared in a similar fashion.
Prior to discussing any trip, event, or activity in which the children’s participation might tend to affect the other parent’s right to contact or visit the child(ren), the parent seeking to allow the children to participate in such trip shall consult with the other so that the two may fashion some mutually agreeable resolution designed to minimize the effect of such trip, activity or event on the other. Neither parent is to take the children out of New York State for a period in excess of 48 hours without advising the other of his/her intent to do so and without providing a phone number and address for the non-traveling parent to reach the other, if necessary.
The parties shall consult with each other and mutually agree upon the children’s education and religious training, summer camp selections, medical providers and the like.
The children should, if the parties mutually believe they are capable of availing themselves of proper use, be provided with cellular telephones and email accounts so that they may speak with, text or otherwise communicate with both parents as they may wish. Neither party is to unreasonably interfere with the children’s desires to communicate with the other parent when not in that parent’s custody.
The court is aware that plaintiffs counsel has argued that she is “unaware of any case where after a trial a parent is awarded joint legal custody, joint physical custody, or anything even approaching a 50/50 time share.” (Proposed disposition dated Mar. 8, 2012 submitted by Ms. O’Donnell at 5, citing Braiman v Braiman, 44 NY2d 584 [1978].) This court has found that such arrangement, under the unique circumstances of this case and after having taken into account all of the evidence and *469 applying the law, to be in these children’s best interests. If this is a case of first impression, then so be it. Indeed, unlike the facts in Braiman, where the parties were so antagonistic that the Court of Appeals held that “ [entrusting the custody of young children to their parents jointly ... is unsupportable when parents are severely antagonistic and embattled” (at 587 [emphasis added]), the parties have demonstrated that they can, and have, worked collaboratively when it comes to the children. In fact, when the court had the children come in for the Lincoln hearing, the parties transported them jointly and the court observed the children to flit from one parent to the other on arrival at the courthouse seamlessly. It is evident that the parties share their desire for the children to be well educated, responsible and successful.
In Braiman, the parties leveled accusations of excessive gambling, lack of ethics, inattention and physical abuse (as to the father) and promiscuity and neglect (as to the mother) against each other. In addition, the Braiman children appeared to have been either neglected or abused and had fared poorly when in the mother’s custody. It was simply implausible to consider that the parties in Braiman could work together to raise their young sons; hence, the Court of Appeals’ decision. By contrast, the parties to this action have not only made no such accusations, but each was able to articulate numerous positive qualities of the other and, especially, the other’s parenting abilities. The Court of Appeals’ observation that “joint custody is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in a mature civilized fashion” (at 589-590) does not preclude this court’s ordering such an arrangement. The Court of Appeals left open the possibility for such an order in an appropriate case. This is, in this court’s view, that case.
The children’s surname is not to be changed from “C.” absent the express consent of both parties or in case of the marriage by the girls or application by the child(ren) for such change to a court of appropriate jurisdiction. Neither party shall initiate, encourage, or allow any person other than the parties hereto to be referred to by the children as “Father/Dad/Daddy” or ‘ ‘Mother/Mom/Mommy. ’ ’
The court commends the parties on raising such impressive young people and wishes these remarkable children the best of everything in their lives; including health, peace, happiness and prosperity. The court hopes that the parties will remember that *470 they will be forever tied through these children and act accordingly. Only by doing so, can the children reap the benefit of the positive qualities of both parents. In this regard, the parties are urged to place the children’s interests above their own and to utilize, to the extent that they can, the other as a resource for child care. For example, if Mr. C. desires to have a dinner alone with W. on occasion as suggested by Dr. Mednick, there is no reason why he should not call upon Mrs. C. to share that time with the girls. The court believes that all would benefit from such an arrangement. However, this would require each parent to accept that the other has something to give to the children that he/she cannot. This is not to say that one parent is better than the other; simply that each has different strengths to offer the children.
The parties are reminded that this matter is scheduled for a settlement conference and/or commencement of trial concerning the financial aspects of this action on November 2, 2012.

. Matter of Lincoln v Lincoln, 24 NY2d 270 (1969).

. Mr. Goldberg has observed that he also believes that the arrangement worked well. (Letter dated Sept. 10, 2012 at 2.)

. The parties are free to agree on what time of day the birthday child(ren) will be transferred from one parent to the other. Of course, each should be cognizant of the fact that the following year, the party who has morning/ evening switches.