OPINION OF THE COURT
Sandra B. Edlitz, J.
Procedural History
On October 31, 1997, petitioner, paternal grandmother, filed a petition of visitation in which she sought to visit with the subject female child, born of the marriage of petitioner’s son and the respondent, her daughter-in-law, on June 28, 1991. In the petition, she stated that such visitation would be in the best interests of the child, and that “[my] son, the child’s father, is presently incarcerated at Elmira Prison.” As set forth more fully below, and what makes this case unique, and apparently one of first impression, is that the grandmother sought visitation in the context of a family dynamic where the reason for her son’s, the child’s father’s, incarceration was the serious domestic violence perpetrated against the respondent, mother, in the presence of the child and, on one occasion, in the presence of the grandmother.
Respondent’s mother’s counsel argued that the petitioner lacks standing to seek visitation with her grandchild “where the grandmother had no relationship with the grandchild and where the grandchild’s father is serving a ten (10) year prison term for committing felonious assault upon the grandchild’s mother in the presence of the grandchild.” Respondent’s counsel submitted a pretrial memorandum of law in support of his position. Petitioner’s counsel argued that there was a significant relationship between petitioner and her grandchild, that any lack of contact was due to interference by the mother, that the domestic violence which occurred by the father against the mother should not affect the relationship between the grandmother and her grandchild, and that petitioner was not aware of the domestic violence. Petitioner’s counsel argued that petitioner did have standing to bring this petition, and that it would be in the child’s best interests to have visitation *646 with her grandmother. The Law Guardian did not take a position until after the hearing.
This court conducted a hearing to determine if the petitioner had standing, or the right to be heard on the issue of best interests on March 4, 1998, March 20, 1998 and April 7, 1998. At the conclusion of the hearing, the court granted respondent’s motion to dismiss. Rendering its decision from the Bench, the court ruled that the petitioner lacked standing. Finding respondent’s testimony more credible than that of the petitioner, the court noted two grounds for dismissing the petition. The first ground concerned the grandparent-grandchild relationship. The court found that the grandmother did not demonstrate a sufficient relationship with the child, nor did she show appropriate efforts to establish and maintain a relationship, and thus concluded that this is not a case where “equity would see fit to intervene.” The second ground was the serious domestic violence perpetrated by petitioner’s son against the wife-mother in front of the child (and once in the presence of the grandmother), which the grandmother did nothing to prevent and to which the grandmother showed a gross insensitivity. This court found that respondent’s decision to deny the grandmother access to her grandchild after January of 1997 was reasonable. This written decision and order amplifies the reasons for the oral ruling.
Factual Background
Petitioner’s case consisted of the testimony of petitioner, her daughter, and her daughter-in-law. Petitioner entered into evidence a letter from respondent to petitioner’s daughter and three photographs taken in 1996 at Christmas, two of which included the child and grandmother posed together. Respondent’s case consisted of the testimony of the respondent mother. The Law Guardian did not call any witnesses. The attorneys stipulated that the petitioner’s son (the child’s father) pleaded guilty to two criminal counts of assault of respondent and is now incarcerated. They further stipulated that there is an order of protection from the County Court, County of Orange, which is in effect until September 4, 2010, whereby the petitioner’s son is to have no contact with respondent or his daughter (the subject child) in person or by telephone.
The testimony of the petitioner grandmother laid bare the troubled relationships in this family. The subject child and her parents (respondent and petitioner’s son) resided with petitioner and her husband for approximately 14 months after the *647 birth of the child. In or around August of 1991, a fight ensued in the grandparent’s residence when respondent asked petitioner not to pick up the child. (Respondent did not want the child to be spoiled.) Petitioner’s husband, who is now deceased, ordered the respondent and his son out of his home and called the police to summarily remove them. The parents and child were forced by necessity to seek accommodations in a hotel. Petitioner did not make an effort to keep them from being “evicted”. By her own testimony, petitioner did not have contact with the child until approximately one month later, nor did she attempt to contact them. The petitioner testified that she saw the child approximately “ten times or more” in 1992. She does not remember how many times she saw her granddaughter in 1993 and 1994, she recalled five times in 1995, five times in 1996, and she stated that she saw her “hardly at all” in 1997. Her last contact with the child was in January of 1997. By her own admission, she spent only three or four Christmas holidays with the child. Presents and cards to the child, telephone contact and visits were sporadic from the time the child moved from the home. She claimed that both her son and respondent were keeping the child from her and that she did not drive a car, making visits difficult. She did not testify to any substantial efforts to sustain a relationship or increase contact with the child.
Petitioner’s son was arrested on November 7, 1996. She borrowed $4,000 and hired a lawyer to represent him in connection with the criminal proceeding. She also hired a lawyer and paid $5,000 to represent him in the divorce action brought by respondent. (The respondent and petitioner’s son are now divorced.) She admitted that she knew that her son, respondent and her grandchild had to live in a hotel, and she never offered them money at any point in time, nor did she ask respondent how her grandchild’s needs were being met. Although she conceded that she was aware that her son had “mental” problems as early as 1992 or 1993, she did not take any steps to protect her grandchild or the respondent. She testified that she believed that her son was a good father, despite his having pleaded guilty to two counts of “felony assault”, and that she felt that the order of protection was “cruel”. Petitioner claimed that she did not know about the domestic violence committed by her son against the respondent. In November of 1996, at a wake for her mother, petitioner saw respondent and she testified that she noticed bruises. Petitioner claimed that this was the first sign of domestic violence that she noticed. Respondent *648 testified credibly that on an occasion prior to the wake her husband had hit her in front of petitioner while they were all in a car together. This court finds that petitioner knew or should have known that there was serious domestic violence by her son against respondent mother in front of the child, and at other times.
Petitioner’s daughter, the child’s aunt, testified that she lived with petitioner, in part, during the period of time that respondent, her brother and the child lived there. Her contact with the child in the presence of the petitioner was minimal after the child was forced to move from petitioner’s home. She recalled an incident testified to by the petitioner during Christmas of 1993 when they went to visit her brother, the respondent and the subject child. The petitioner had an argument with her son, and she and the petitioner left the house early. She also remembered seeing respondent with bruises at the wake for her grandmother. She testified that she was present when the petitioner asked respondent for money for the criminal defense of petitioner’s son, and she stated specifically that petitioner did not offer money to respondent for the child. She also related that the petitioner borrowed money to pay her brother’s lawyer to “fight [respondent’s] application for child support.”
The testimony of a daughter-in-law of petitioner did not provide much additional information. She lived in petitioner’s home “on and off’ for the last eight years, including the time when respondent, the child and the father were there.
Respondent’s case consisted of the testimony of the respondent. Respondent and the child’s father lived with the petitioner grandmother and her husband when her child was born, June 28, 1991, until August 1992. At the time that her father-in-law called the police, and she and her husband and child were escorted from the premises, respondent was not working and her husband was on disability. They stayed in a hotel for three weeks, paying with credit cards. They then rented a house in Wappinger Falls, New York, for two years. Petitioner saw the child once every few months. The relationship between respondent’s husband and petitioner and petitioner’s husband was strained. They argued a lot. When petitioner’s husband died in September of 1992, the relationship between petitioner and her son deteriorated. He accused petitioner of poisoning his father and of causing his father’s death. They always argued on the phone, which respondent claimed scared the child. From April 1994 to July of 1996, respondent and the *649 father and child moved to Poughkeepsie, New York. According to respondent, the contact between petitioner and the child during that period was infrequent. In July of 1996 they moved again, and for the next five months petitioner saw the child four times. At that time, the father’s relationship with petitioner was “getting worse.” In November of 1996 the father was arrested for assaulting the respondent.
The respondent’s testimony with respect to the domestic violence made real a tragic situation. According to her testimony, petitioner’s son, her then husband, was handcuffing respondent in the bathroom for the entire day. She slept on the bathroom floor while handcuffed. The only time he would “let her out” was to put the child on the school bus or to eat with him. She sustained multiple injuries at his hands including a twice broken nose, broken ankle and two broken ribs. He tore the hair out of her head. He beat her up daily, threatening to kill her. On the date of the arrest while they were driving he punched her in the face and her blood “splattered”. He threatened to kill her and her father. She asked him to stop for gas. When he pulled up to the gas station, she ran from the car screaming. The police were called and arrested him.
In the three-week period prior to the arrest, respondent saw petitioner in the hospital while visiting petitioner’s mother, who was ill. Respondent had two black eyes, bruises on her face and bald and thinning spots on her head where her husband had torn her hair out. She testified she “looked disgusting.” Petitioner viewed her condition while in the hospital, but did not ask her how she sustained the injuries. On that same day petitioner, petitioner’s son and respondent were in a car together. Petitioner was seated in the front of the car and respondent was in the back. During an argument, petitioner’s son turned around in the car, grabbed respondent by the hair and pulled the hair out of her head. According to respondent’s testimony “petitioner told him to stop.” He later shoved respondent “around”. He stated under his breath, with petitioner present, “one day I’m going to kill her.” Petitioner’s mother died shortly thereafter. At the wake, respondent had black eyes and bruises on her face. Petitioner told respondent to make certain to wear a hat and makeup because she “did not want anyone to think anything.” On no occasion did petitioner ask respondent if she or the child were safe.
Respondent testified that the domestic violence had occurred in front of the child. The child witnessed the arguments, the threats and the violence perpetrated against her mother by her *650 father. The child also witnessed arguments between petitioner and her son where he would accuse petitioner of trying to kill the child, of harming the child and of being responsible for his father’s death.
After the arrest of the respondent’s husband, and as a result of the brutal domestic violence described above, respondent and the child entered counseling. The child continues to attend therapy to date. After January of 1997, the mother testified that she denied petitioner access to the child.
The reasons the mother denied access at that time are several. In respondent’s letter to petitioner’s daughter, which was entered into evidence, she explained that she had not returned phone calls because she was undergoing dental work with a lot of discomfort as a result of petitioner’s son’s assaults upon her, and she was attending therapy. Respondent stated in that letter that her therapist advised her “to take time for herself and to heal because she had been under extreme stress and trauma.” Respondent testified, also, that visits with petitioner were traumatizing for the child, who had become quiet, withdrawn and clingy after visits. Respondent conceded that petitioner had affection for the child, but that petitioner made poor judgments in light of the circumstances. Respondent’s most serious “complaint” against the petitioner is that she believed that petitioner knew that her son was sick and violent but did not make any attempt to get him help or to protect her and her daughter. This court has had the opportunity to assess the demeanor and credibility of the witnesses, and due deference should be given to its factual findings. (See, Matter of Alice A. v Joshua B., 232 AD2d 777.) This court finds respondent’s testimony to be credible, and petitioner’s testimony to be incredible.
Applicable Law
There is no common-law right for a grandparent to have visitation with her grandchild. The statutory authority for such a right is set forth in Family Court Act § 651 (b) and in Domestic Relations Law §§ 72 and 240 (1). Family Court Act § 651 (b) provides that: “When initiated in the family court, the family court has jurisdiction to determine, in accordance with subdivision one of section two hundred forty of the domestic relations law and with the same powers possessed by the supreme court in addition to its own powers, habeas corpus proceedings and proceedings brought by petition and order to show cause, for the determination of the custody or visitation *651 of minors, including applications by a grandparent or grandparents for visitation rights pursuant to section seventy-two or two hundred forty of the domestic relations law.” Domestic Relations Law § 72 provides, in pertinent part, that “[w]here either or both of the parents of a minor child, residing within this state, is or are deceased, or where circumstances show that conditions exist which equity would see fit to intervene, a grandparent or the grandparents of such child * * * may apply to the family court pursuant to subdivision (b) of section six hundred fifty-one of the family court act; and on the return thereof, the court, by order * * * may make such directions as the best interest of the child may require, for visitation rights for such grandparent or grandparents in respect to such child.”
As set forth in the seminal case of Matter of Emanuel S. v Joseph E. (78 NY2d 178), the court must apply a two-pronged test in determining an application made pursuant to Family Court Act § 651 (b) and Domestic Relations Law §§ 72 and 240 (1). “First, it must find standing based on death or equitable circumstances which permit the court to entertain the petition. If it concludes that the grandparents have established [standing], then it must determine if visitation is in the best interest of the grandchild.” (Matter of Emanuel S. v Joseph E., 78 NY2d 178, 181.) In this case both parents are alive, and therefore the court must determine if equitable circumstances exist. This is to be contrasted with a custody-visitation case involving one parent against another, where the court would determine the best interests of the child. (See, Eschbach v Eschbach, 56 NY2d 167.)
Standing, which is the right to be heard, is not automatically conferred. The court must examine all of the relevant facts, and make a determination on a case-by-case basis. The factors which are germane to the issue of standing are the nature and extent of the grandparent-grandchild relationship and the nature and basis of the parents’ objection to visitation. (Matter of Emanuel S. v Joseph E., supra, at 182.) In further elucidating upon the grandparent-grandchild relationship, the New York Court of Appeals went on to state that, “It is not sufficient that the grandparents allege love and affection for their grandchild. They must establish a sufficient existing relationship with their grandchild, or in cases where that has been frustrated by the parents, a sufficient effort to establish one, so that the court perceives it as one deserving the court’s intervention. If the grandparents have done nothing to foster a relationship or demonstrate their attachment to the grandchild, *652 despite opportunities to do so, then they will be unable to establish that conditions exist where ‘equity would see fit to intervene.’ The evidence necessary will vary in each case but what is required of grandparents must always be measured against what they could reasonably have done under the circumstances.” (Matter of Emanuel S. v Joseph E., at 182-183.)
In determining standing in the instant case, the court had two areas of concern. The first concern was that the grandmother did not demonstrate a sufficient relationship with the child, nor did she show an appropriate effort to establish and maintain that relationship. The second concern was the severe domestic violence in this case, which petitioner knew about.
With respect to the first concern, the petitioner did not make enough of an effort to spend time with the child from the time that the child was forced to move from petitioner’s home, nor did she endeavor to effectuate their return. She did not try to convince her husband not to turn them out of the home abruptly. She did not try to help them to find suitable living quarters. She did not offer them money. She did not visit with or telephone the child on a regular basis. She did not have an involvement in this child’s life. She did not offer this child time to be with her. She did not spend many holidays or vacation periods with the child. She did not write often to the child. She did not send the child birthday cards, or give the child birthday presents and Christmas gifts regularly. She did not give the child any money, nor did she offer the child and mother a place to live after her son was arrested. She did not provide grandmotherly nurturance and guidance. She did not provide this child with physical or emotional protection.
This grandmother could have made many efforts under the circumstances. She could have asked other family members to drive her for regular visits with her grandchild, if her lack of driving was an issue. She could have made certain that she spent all major holidays and many vacations with the child. At the minimum, she could have established regular telephone contact with the child and written her many letters. She could have provided money for her grandchild, and if she had to borrow it, she could have. There are so many ways she could have made herself an important person in this child’s life, but failed to do so. (See, Matter of Luma v Kawalchuk, 240 AD2d 896 [in which the Appellate Division, Third Department, did not find standing where the grandparents did not make a sufficient effort to establish a relationship with the grandchildren which effort is measured against what they could reasonably have *653 done under the circumstances]; see, Matter of Seymour S. v Glen S., 189 AD2d 765 [in which the Appellate Division, Second Department, likewise denied standing to a grandparent who failed to establish sufficient contacts with his granddaughter].)
This court, as argued by petitioner’s counsel, must examine the denial of access by respondent to the grandchild. This mother did not deny this grandmother access to the child until January of 1997. As to her reasons for doing so at that time, this court found that they were reasonable and justified given the unimaginably brutal domestic violence in this case, which necessitated painful dental work and emotional therapy for the mother. Also, this court took into account the impact of the domestic violence upon the child, which necessitated emotional therapy for the child, which continues to date.
The second concern is intertwined with the relationship between the grandmother and grandchild, and involves the domestic violence. The petitioner failed to protect the respondent, the mother of the child and her daughter-in-law, from the serious physical and emotional abuse perpetrated by her son, which occurred in the presence of the grandchild. The petitioner failed to obtain help of any kind for this mother and her grandchild. Rather, at every juncture, she chose to ignore the violence, and, in fact, to ask respondent to conceal it from others. She chose to support her son financially, to the detriment of her grandchild, and, in fact, gave money to her son to “fight” having to give child support to this child. She should have realized the impact the violence had on her grandchild, who was of tender years. Her failure to protect this mother was also a failure to protect her grandchild.
The domestic violence in this case was shocking and brutal. This court is aware of no case on point regarding domestic violence in the context of a determination of standing in a grandparent visitation application. The Legislature amended Domestic Relations Law § 240 (1), pursuant to 1996 amendments (L 1996, ch 85), to require that the court consider the effect of domestic violence upon the best interests of the child in determining custody or visitation, as follows: “Where either party to an action concerning custody of or a right to visitation with a child alleges in a sworn petition or complaint or sworn answer, cross-petition, counterclaim or other sworn responsive pleading that the other party has committed an act of domestic violence against the party making the allegation or a family or household member of either party, as such family or household member is defined in article eight of the family court act, and *654 such allegations are proven by a preponderance of the evidence, the court must consider the effect of such domestic violence upon the best interests of the child, together with such other facts and circumstances as the court deems relevant in making a direction pursuant to this section.” (See, Matter of E. R. v G. S. R., 170 Misc 2d 659.) While Domestic Relations Law § 240 (1) is not directly applicable to this case, the legislative findings are instructive.
In the legislative findings regarding the amendment of Domestic Relations Law § 240 (1), it is stated that “[t]he legislature finds and declares that there has been a growing recognition across the country that domestic violence should be a weighty consideration in custody and visitation cases.” (L 1996, ch 85, § 1, eff May 21, 1996.) In 1994, the Model Code on Domestic and Family Violence of the National Council of Juvenile and Family Court Judges “called upon the court to consider as primary the safety and well-being of the child and the abused parent in setting visitation”. The legislative findings also provide that: “The legislature recognizes the wealth of research demonstrating the effects of domestic violence upon children, even when the children have not been physically abused themselves or witnessed the violence. Studies indicate that children raised in a violent home experience shock, fear, and guilt and suffer anxiety, depression, somatic symptoms, low self-esteem, and developmental and socialization difficulties. Additionally, children raised by a violent parent face increased risk of abuse. A high correlation has been found between spouse abuse and child abuse.” (L 1996, ch 85, § 1.) The grandmother in this case, because of her knowledge of the domestic violence, and because of her failure to make any attempts to protect this child, should be denied visitation on that basis alone.
For all of the aforementioned reasons, this court agrees with respondent’s position and that of the Law Guardian which he presented during summation, that the petitioner lacks standing to seek visitation with her granddaughter. Since the petitioner lacks standing, the court need not reach the issue of best interests. Accordingly it is ordered that the instant petition for visitation is therefore dismissed.