In the Matter of THEODORE KREBSBACH, Respondent, v NANCY GALLAGHER, Appellant.

Second Department, August 3, 1992

APPEARANCES OF COUNSEL

*Labert Lang & Willen (Robert D. Lang, Morton I. Willen* and *Karen D. McGuire-Mangan* of counsel), for appellant.

*White & Cirrito (Michael L. Cirrito* of counsel), for respondent.

*Joseph P. Abbenda, Law Guardian,* for infant.

**OPINION OF THE COURT**

BALLETTA, J.

We recognize at the outset the general rule that custody determinations are ordinarily a matter of discretion for the hearing court *(see, Gage v Gage,* 167 AD2d 332). However, while the hearing court's determination, based as it is upon a firsthand assessment of the parties, their credibility, their character, and temperaments, should be accorded great deference on appeal *(see, Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946; *Eschbach v Eschbach,* 56 NY2d 167; *Skolnick v Skolnick,* 142 AD2d 570), the authority of this court is as broad as that of the hearing court *(Matter of Louise E. S. v W. Stephen S., supra; Leistner v Leistner,* 137 AD2d 499), and we would be seriously remiss if, simply in deference to the findings of the hearing Judge, we allowed a custody determination to stand where, as here, it lacks a sound and substantial basis in the record *(Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76; *see also, Skolnick v Skolnick, supra).*

With respect to any determination as to a change of custody, the paramount consideration must be the best interests of the children *(see, Eschbach v Eschbach, supra; Friederwitzer v Friederwitzer,* 55 NY2d 89; *Keating v Keating,* 147 AD2d 675). Among the factors to be considered are the quality of the home environment and the parental guidance the custodial parent provides for the child *(see, Eschbach v Eschbach, supra,* at 172; *Matter of Ebert v Ebert,* 38 NY2d 700, 702), the ability of each parent to provide for the child's emotional and intellectual development *(see, Porges v Porges,* 63 AD2d 712, 713), the financial status and ability of each parent to provide for the child *(see, Eschbach v Eschbach, supra),* the relative fitness of the respective parents, and the length of time the present custody arrangement has been in effect *(see, Matter of Nehra v*

*Uhlar,* 43 NY2d 242). Moreover, priority in custody disputes should usually be given to the parent who was first awarded custody by the court or to the parent who obtained custody by voluntary agreement *(see, Robert C. R. v Victoria R.,* 143 AD2d 262, 264; *Richman v Richman,* 104 AD2d 934, 935; *see also, Friederwitzer v Friederwitzer, supra,* at 94; *Matter of Nehra v Uhlar, supra,* at 251; *Mascoli v Mascoli,* 132 AD2d 653). It is well settled, furthermore, that the courts will not disrupt sibling relationships unless there is an overwhelming need to do so *(see, Eschbach v Eschbach, supra,* at 173; *Matter of Ebert v Ebert, supra,* at 704; *Obey v Degling,* 37 NY2d 768; *Matter of Jones v Payne,* 113 AD2d 968, 969; *Pawelski v Buchholtz,* 91 AD2d 1200).

With these principles firmly in mind, it becomes clear that the Family Court's determination to award sole custody to the father was improper and contrary to the best interests of the children.

The parties herein were married on October 27, 1979, and had two sons, Ryan, born on June 6, 1981, and Kevin, born on September 6, 1982. Pursuant to the terms of a separation agreement entered into on or about March 17, 1987, and subsequently amended on January 6, 1988, the parties shared joint custody of the two boys, with the children's primary residence being with the mother. The father was to have visitation every Tuesday afternoon until 8:30 P.M., two out of every four weekends, the entire month of August and one half of the major holidays and school vacations. The judgment of divorce entered March 4, 1988, incorporated the provisions of the amended separation agreement. The mother remarried in July 1988 and the father remarried in September 1990.

In December 1988 and then again in August 1989, the mother petitioned to modify the visitation schedule. In November 1989, the father cross-petitioned to modify the visitation schedule. Subsequently, each party withdrew the previously filed petitions and filed a new petition seeking sole custody. Forensic examinations were conducted and a hearing on custody was commenced in September 1990. After several days of testimony, the parties stipulated to adjourn the hearing pending therapy sessions with a court-appointed psychiatrist, Dr. Marc S. Reubins. The hearing recommenced in January 1992, and on March 26, 1992, the Family Court transferred custody to the father.

We find that, contrary to the Family Court's determination,

the mother is a loving and caring parent who, with her second husband, has established a comfortable and stable family environment within which to raise the children. The evidence shows that the children were doing well in school, enjoyed playing with their friends in the neighborhood in which they lived, were active in extracurricular activities and loved and enjoyed living with their stepbrothers. Moreover, although their wishes are not determinative owing to their youth, it is interesting to note that both boys, during an in camera interview, indicated a preference to stay with their mother *(see, Matter of Donna G. v Gloria G.,* 153 AD2d 558). Dr. Reubins noted that the mother loved her children very much *(see also, Matter of Joseph P. B. v Margaret O'D.,* 161 AD2d 545).

The father and the Family Court refer to the alleged interference by the mother with the father's visitation. However, while there were often problems with visitation, there is nothing in the record which would suggest that the mother intentionally interfered with visitation or that her conduct rose to such a level that she should be deprived of custody *(see, Matter of Hohenforst v Hohenforst,* 169 AD2d 952; *Keating v Keating, supra; Leistner v Leistner, supra; Resnick v Zoldan,* 134 AD2d 246). In fact, the hearing testimony, as well as the transcripts of taped telephone conversations between the parties, show that many of the problems that arose with respect to visitation were precipitated by the father's repeated efforts, indeed on an almost weekly basis, to renegotiate the terms of the Tuesday evening visitation *(see, Weinreich v Weinreich,* — AD2d — [2d Dept, June 1, 1992]; *Skolnick v Skolnick, supra).* The record indicates that the mother, although she was not required to do so by the separation agreement, would allow the father to visit the children on another weeknight whenever he could not make the scheduled Tuesday visitation. There is not one scintilla of evidence that the mother discouraged the boys from visiting with their father.

Moreover, while there was animosity between the mother and the father and his parents such that joint custody was no longer appropriate *(see, Lohmiller v Lohmiller,* 140 AD2d 497; *Trolf v Trolf,* 126 AD2d 544; *Robinson v Robinson,* 111 AD2d 316, 318), this animosity did not spill over to the children. Indeed, as the Family Court observed: "The boys love both their mother and their father. They enjoy the time they spend with their father. They have good feelings about their rela-

tionship with other people in their lives including their grandmother and grandfather. They enjoy the time they spend with their grandparents." In this regard, it is important to note the testimony of Dr. Reubins, who, after treating the parties once a week for almost 16 months for over 50 sessions, noted that the mother had made progress in dealing with her feelings toward the father and that "she hasn't poisoned the kids".

Nor, as has been suggested by the father and the Family Court, is there any evidence that the mother and her second husband have attempted to alienate the boys from their father. Again, after 16 months of observing the parties in therapy, Dr. Reubins unequivocally stated that he saw no signs of "parent alienation syndrome"—"I don't think there is a plot or plan to alienate the children". As far as the mother's second husband was concerned, Dr. Reubins noted that he was merely attempting to be a good parent to the two boys. Moreover, Dr. Reubins also testified that although there may have been a "lack of vigilant planning" on the part of the mother and father, he saw no evidence of a malevolent intent to deny the father access to his children or to deny him his appropriate role.

Similarly, many of the complaints raised by the father and many of the reasons given by the Family Court in support of its decision to change custody merely reflect a difference in parenting styles rather than any unfitness by the mother. Indeed, Dr. Reubins pointed out that while "[t]heir general values of home and family and sports and school are very parallel, their specific values of cinema and comics and reading perhaps are different". Significantly, Dr. Reubins testified that the mother's parenting skills had improved during the course of therapy.

In contrast, Dr. Reubins's testimony paints a picture of the father as being a manipulative and controlling personality who is not content unless he gets his own way. For example, the father's need to control his sons' lives translated into a battle for sole custody, and his failure to understand that his sons had a social life separate from his. Dr. Reubins was concerned "about the [father's] capacity to parent these children independent of his own needs * * * He had a hard time appreciating that this kid had a life too". Moreover, many of the problems between the parties arose because of the constant provocation by the father. Finally, Dr. Reubins expressed grave concern because the father had recorded extensive notes of the parties' therapy sessions for use at the

custody trial, noting that a person who engages in such note-taking is not truly a part of the therapeutic process. While the father was a controlling individual, the mother did not mind sharing the children with the father.

Significantly, Dr. Reubins noted that a forensics report from August 1990 had said that there was no reason to change custody and that he had earlier testified on September 11, 1990, that a change of custody was not in the best interests of the children. Indeed, Dr. Reubins had testified in September 1990 that removal of the children from the custodial parent would be a "dramatic and catastrophic approach". Furthermore, although the parties' stipulation provided that Dr. Reubins provide therapy to the parties and give a recommendation as to custody, he limited his role to one of therapist only and refused to make a recommendation as to custody. Nevertheless, in response to a question from the Law Guardian, Dr. Reubins opined that if the father could only be satisfied by a transfer of custody to him, then "that would be unfortunate because I don't think it [i.e., a change in custody] has to be so dramatic". In this regard, it should also be noted that the Law Guardian also recommended against a change of custody. The Family Court's disregard for these recommendations of these two impartial observers is inexplicable in this case (see, Matter of Severo E. v Lizzette C., 157 AD2d 726-728).

In conclusion, the Family Court's determination is without a sound and substantial basis in the record and cannot be sustained. As has been observed, "Where there is no indication that a change in custody will result in significantly enhancing a child's welfare, it is generally considered in his best interest not to disrupt his life" (Pawelski v Buchholtz, supra, 91 AD2d, at 1201; see also, Matter of Gitchell v Gitchell, 165 AD2d 890, 895; Matter of Fountain v Fountain, 83 AD2d 694, affd 55 NY2d 838). Accordingly, the order is reversed, the father's petition is denied, the mother's cross petition is granted, and the mother is awarded sole custody of the two boys (see generally, Matter of Ruffin v Ruffin, 166 AD2d 598; Matter of Coyne v Coyne, 150 AD2d 573; Savas v Savas, 127 AD2d 578). The father shall have visitation away from the mother's residence, as follows:

(a) During the school year, on alternate weekends, from 6:00 P.M. on Friday until 8:00 A.M. on Monday: the father shall be responsible for taking the children to school on Monday mornings or returning them to the mother when there is no school.

(b) Four weeks during summer vacations: the father may take the four weeks consecutively or may split them up, two weeks in July and two weeks in August, and shall notify the mother by the first day of June as to which option he is choosing, and which weeks he will use for visitation.

(c) Father's Day and the father's birthday.

(d) Alternate holidays, commencing with Labor Day 1992, as follows: New Year's Day, Martin Luther King Day, Lincoln's Birthday, Washington's Birthday, Easter Sunday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, Christmas Eve and Christmas Day.

The father also shall have the children on their birthdays in alternate years, commencing in 1992, and also shall be able to telephone the children once each week. Where a holiday, Father's Day, or a birthday falls within the father's regularly scheduled weekend visitation, there shall be no right to an alternate day for visitation as makeup time.

Finally, in a word to appellate counsel and, in particular, the father's attorneys, we note, as this court observed in the case of *Merl v Merl* (128 AD2d 685, 686): "[We] take this opportunity to remind counsel * * * that the function of an appellate brief is to assist, not mislead the court *(Matter of Cicio v City of New York*, 98 AD2d 38, 40). In their brief, the counsel * * * [have] improperly injected matters that are dehors the record, mischaracterized events and fabricated facts and issues. We admonish counsel that such attempts to mislead the court are in direct derogation of their professional obligations and will not be tolerated *(see also, Matter of Peterson v New York State Dept. of Correctional Servs.*, 100 AD2d 73, 78, n 5)".

Mangano, P. J., Lawrence and Copertino, JJ., concur.

Ordered that the order is reversed, on the law and on the facts, with one bill of costs, the father's petition is denied, the mother's cross petition is granted, and sole custody of the two children of the marriage is awarded to the mother with visitation to the father, as follows: (a) during the school year, on alternate weekends, from 6:00 P.M. on Friday until 8:00 A.M. on Monday: the father shall be responsible for taking the children to school on Monday mornings or returning them to the mother when there is no school; (b) four weeks during summer vacations: the father may take the four weeks consecutively or may split them up, two weeks in July and two weeks in August, and shall notify the mother by the first day

of June as to which option he is choosing, and which weeks he will use for visitation; (c) Father's Day and the father's birthday; (d) alternate holidays, commencing with Labor Day 1992, on the following holidays: New Year's Day, Martin Luther King Day, Lincoln's Birthday, Washington's Birthday, Easter Sunday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, Christmas Eve, and Christmas Day; (e) on the children's birthdays in alternate years, commencing in 1992; and it is further,

Ordered that the father shall be able to telephone the children once each week, and where a holiday, Father's Day, or a birthday falls within the father's regularly scheduled weekend visitation, there shall be no right to an alternate day for visitation as makeup time.