OPINION OF THE COURT
Howard Spitz, J.
On February 15, 1996, E. R. (hereinafter referred to as the *661 Petitioner or the Father), filed, a petition in this court seeking custody of his son, E. J. R, the subject child, born February 4, 1992. Petitioner alleges, inter alia, that G. S. R., the mother of the subject child, is mentally ill and mentally abusive to their son.
On March 4,1996, L. G. D.-R., also known as G. S. R. (hereinafter referred to as the Respondent or the Mother), filed a petition in this court seeking custody of the subject child. She alleges, inter alia, that she has had de facto custody of the subject child since his birth, and provides him with a stable home. She further alleges that the Father has a history of domestic violence, and that the child has witnessed the violence.
At all relevant stages of the proceeding, the parties were represented by retained counsel. The child was represented by a court-appointed Law Guardian. On April 10, 1996, the court awarded temporary custody of the child to the Mother with visitation to the Father, and directed clinical evaluations. The fact-finding hearing commenced on May 30, 1996, was continued on several other days, and concluded on September 5,1996. The court heard the testimony of both parties, the Petitioner’s mother, stepfather and former wife, the Respondent’s mother, two of Respondent’s friends, her fiancé, and the therapist for one of her other children. Dr. L., who performed the court-ordered clinical evaluations, also testified.
It is undisputed that in March 1995, the parties entered into a voluntary agreement for joint custody of the subject child. They agreed, inter alia, that the child would reside with his Mother and that his Father would pay $500 per month child support. The Petitioner was also given alternate weekend visitation and one weekday evening visit.
The evidence elicited at trial regarding the Respondent’s early childhood is most relevant, especially the escapades of her mother who married a Mr. N. D., when she was 18 years of age and who is the biological father of the Respondent. He was found dead in a hallway when the Respondent was less than a year old. Three months later, her mother married a J. C. who physically abused both Respondent and her mother. He is presently serving a lengthy prison sentence for manslaughter. She divorced Mr. C. in 1973. She visits him three times a week in State prison despite the fact that she has been married for the past 22 years to a R. G., also an abuser. Respondent testified that as a child she did not receive any love or affection from her mother or any stepfather.
*662 A PINS petition was filed by her mother for verbal abuse when the Respondent was about 14 years of age and she spent two years at St. Dominic’s Home. She also spent about one month in a hospital for an attempted suicide evaluation; she claims she swallowed one pill to gain attention but denies attempting suicide.
At 17 years of age, Respondent left her mother’s home and married one K. D.; the marriage was later annulled. She then had a relationship with R. W., and on August 21, 1987 gave birth to R., her first child. While pregnant with R., she married a R. L., but divorced one year later. In 1990, she gave birth to A. A.’s biological father is A. L. who has recently come back into Respondent’s life. In fact, they are living together and are engaged to be married once Respondent’s divorce from Petitioner is finalized.
Respondent met the Petitioner in late 1990 and married him in 1993. She gave birth to E. in early 1992. They separated in 1995, and entered into the aforesaid joint custody agreement. Petitioner Father claims that he should obtain custody of the subject child, due in significant part to Respondent’s unstable life. However, Petitioner’s own life and behavior is certainly less than stellar. In fact, he admits to slapping the Respondent three times on one occasion, throwing food at her another time, and in a fit of anger and jealousy, destroying an entire dining room set in their home with a baseball bat on yet another occasion, apparently in the presence of the child. Respondent accused him of raping her in August of 1994. Although he was indicted by a Grand Jury and spent over 30 days in jail, the charges were later dropped. He denied this charge. He also admitted hitting Respondent’s oldest child, R., with a belt and later apologizing to him.
According to the testimony of his former wife, K. G., Petitioner was also violent toward her. She recalled an incident in or around Thanksgiving 1990 when Petitioner removed her clothes from the closet, struck her on the head and arm, and hit her with hangers. They separated shortly thereafter. During a court proceeding, he also, verbally threatened her.
In addition to his history of violent behavior, Petitioner’s financial stability is also highly suspect. Although he is a plumber, and evidently works on a regular basis, he declared personal bankruptcy in January 1996 to discharge his debts. Mr. and Mrs. C. Z., Petitioner’s mother and stepfather, testified in his behalf, and basically stated that they would be available for the child if Petitioner was awarded custody. It is *663 interesting to note, however, that Petitioner left home at age 16 because his stepfather was too strict, the same person who would be part of his extended family if custody was awarded to him. Respondent’s mother, R. G., who testified against her, cites an incident in January 1996 wherein Respondent supposedly attacked her for not being able to babysit. Mrs. G. commenced a family offense proceeding which was dismissed by this court after a hearing.
Petitioner attempted to show that Respondent’s parenting skills were poor by highlighting some behavioral problems involving R., Respondent’s eldest child. The testimony of Dr. C., a therapist recommended by the school who has been treating R. since May, acknowledges that he has had some academic and behavioral problems. Nonetheless, she states that he and his Mother have a very close relationship and that she is concerned about him and involved and cooperative with his therapy. R. lived with his maternal grandmother for several years, but has resided exclusively with the Respondent since January 1996. Dr. C. also stated, interestingly enough, that R. expressed fear of the Petitioner referencing an incident some years ago where Petitioner left him on the side of the road during a trip.
The court also heard Mr. L.’s testimony and was impressed with his sincerity and the manner in which he said he would take care of the children. He expressed love for the Respondent, will marry her and has expended considerable time and financial resources to assist her in these proceedings. He is a stable, responsible person, having held the same job for 14 years, and was a very credible witness.
Dr. L. met with both parties, Petitioner’s parents, Respondent’s fiancé and Respondent’s mother, and concluded that custody should be awarded to the Father. He felt that Petitioner was more emotionally stable and better able to adapt to changes in a child’s development. He found Respondent to be emotionally and verbally explosive, with a tendency to externalize blame and an inability to negotiate with the Petitioner.
It is settled law that the paramount consideration with respect to a change of custody determination must be the best interests of the child. (Eschbach v Eschbach, 56 NY2d 167.) Among the factors to be considered are the quality of the home environment and the parental guidance the custodial parent provides for the child. (See, Eschbach v Eschbach, supra, at 172.) Additional factors include the ability of each parent to *664 provide for the child’s emotional and intellectual development (Porges v Porges, 63 AD2d 712), and the financial status and ability of each parent to provide for the child. (See, Eschbach v Eschbach, supra, at 172.) Courts have also considered the relative fitness of each parent, and the length of time the present custody arrangement has been in effect. (See, Krebsbach v Gallagher, 181 AD2d 363.) Moreover, the existence of a prior custody arrangement agreed upon by the parties should be given great weight in the absence of extraordinary circumstances. (Matter of Nehra v Uhlar, 43 NY2d 242, 251.)
In addition to the common-law factors set forth above, the court is now also mandated by statute to consider the impact of domestic violence on the child in custody/visitation proceedings. (See, L 1996, ch 85, eff May 21, 1996.)
The legislative policy as set forth in section 1 of the Act (L 1996, ch 85) states: "Rather than imposing a presumption, the legislature hereby establishes domestic violence as a factor for the court to consider in child custody and visitation proceedings, regardless of whether the child has witnessed or has been a direct victim of the violence.”
In the case at bar, Respondent alleged Petitioner’s domestic violence in her petition, and Petitioner made several admissions as noted earlier. Therefore, the court is required to factor this domestic violence into the equation when determining which custody arrangement would be in the child’s best interests.
Each custody case must be decided on its own particular facts and with due consideration given to each and every relevant factor. (See, Matter of Pasco v Nolen, 154 AD2d 774.) The court has observed the parties over many days, and has carefully assessed their credibility and demeanor, as well as that of their witnesses. In short, the court has painstakingly reviewed all the relevant evidence, including Dr. L.’s report and testimony.
The evidence, viewed in its entirety, shows that both parties are far from perfect. They each have a dubious history, starting at childhood, and culminating in unsuccessful and often deleterious adult relationships. One such relationship is that between the parties themselves. This relationship, however, produced a child, and it is now the responsibility of this court to determine with which parent this child should live. It is a formidable task, and Dr. L. himself admitted in his report that this is a "difficult matter”. Nonetheless, a decision must be made.
*665 It is well established that "priority in custody disputes should usually be given to the parent who was first awarded custody by a court or to the parent who obtained custody by voluntary agreement”. (Krebsbach v Gallagher, 181 AD2d 363, 365, supra [emphasis added].) Moreover, courts will not disrupt sibling relationships unless there is an overwhelming need to do so. (Supra.) Petitioner has failed to show that a change of custody would be in the child’s best interests or that there was any overwhelming need to remove the child from his present home where he resides with his two half brothers. At best, Petitioner showed that Respondent was born into a violent and unstable family, and has endured her own instabilities in adulthood. No evidence was presented to even remotely establish that she is an unfit mother, or that she has, in any way, harmed her children. Respondent has made many mistakes during her life, but then again so has the Petitioner. These mistakes are not enough to wrest custody away from Respondent after both parties agreed just over one year ago that the child should live with the Respondent. Respondent is presently employed as a medical technician and is involved in a stable relationship with Mr. L. She and Mr. L. are providing a secure homelife for all three of Respondent’s sons. The boys, except for normal sibling scuffles, appear to get along well with each other.
The Petitioner, on the other hand, has had two unsuccessful marriages, scarred by his jealous temperament and domestic violence. Moreover, the child has never resided with him on any long-term basis. Petitioner’s plans for accommodating the child in his rental apartment are speculative at best. While he expresses a desire to convert a patio into a bedroom, he does not address how he will go about achieving that goal, since he does not own the property. The fact that he has a close relationship with his landlord does not translate into any guarantee that the landlord will renovate his property to accommodate a tenant.
In determining that custody should remain with Respondent, the court is fully cognizant of the recommendations of Dr. L. and the Law Guardian, but is still compelled to reject them. In doing so, the court is mindful of precedent which holds that expert recommendations are entitled to some weight. (See, Young v Young, 212 AD2d 114.) However, a court is free to reject such recommendations if it sets forth "convincing reasons” for doing so. (Linda R. v Richard E., 162 AD2d 48.)
Generally, Dr. L.’s custody recommendation seems to be grounded in his perception of the Respondent as evasive, anx *666 ious and histrionic, whereas the Petitioner was more composed and direct. Yet, Dr. L. did not explain with any clarity why Petitioner would move back in with Respondent after she accused him of rape, or why Petitioner voluntarily signed an agreement giving the Mother physical custody of the child, a tacit admission on his part that Respondent was a fit custodial parent for his son. This agreement was advanced at Petitioner’s urging, and prepared by his attorney.
While the court respects Dr. L.’s opinion, it nonetheless disagrees with it. His interviews with the parties took about five hours. The court observed and heard the parties during some seven days of testimony. Respondent was obviously nervous and anxious, but she was also sincere. She presented as a loving Mother distraught with grief at the possibility of losing her son. Her frequent crying, as this court observed, was heartfelt, not histrionic.
The court must note that it finds several weaknesses in Dr. L.’s recommendation. For example, he appears to trivialize the Respondent’s difficult upbringing, and blames her exclusively for her problems. While the court certainly agrees that each person is ultimately responsible for his/her own destiny, it also recognizes the distinct possibility that Respondent’s violent and dysfunctional homelife as a child played a significant role in her difficulties as an adult. Despite these obstacles, she has made and continues to make diligent efforts to improve her life.
By the same token, Dr. L. commends Petitioner for his control, and skims over the many episodes of domestic violence, except to say that Petitioner was forthcoming in his admissions. Dr. L. offered very little as to the effects the domestic violence exhibited by Petitioner in both of his marriages might have on his son.
In addition, Dr. L. acknowledged that Respondent has been the more primary parent in the subject child’s life. He offered no compelling testimony why the siblings should be separated, when in fact, they have been together for the better portion of their lives and appear to have bonded with each other. There was no testimony that any of the children had ever been abused or neglected by their Mother.
Dr. L. expressed concern that the Respondent would try to influence and brainwash the child against the Petitioner. However, the testimony reveals no such negative impact upon the child and in fact, both the weekend and weekday visitation has been effected smoothly and without reported incident.
*667 The Law Guardian also agreed with Dr. L.’s recommendation of custody to the Father. However, the court is also compelled to disagree with her. While she mentions the "best interests” standard, she bases her recommendation on the misplaced premise of "least detrimental”. She makes this recommendation without ever having observed the children together, and while admitting that both parents behaved appropriately and affectionately when she saw them with the subject child. The Law Guardian also glossed over the possible negative impact of separating the siblings, and she too, discounted the history of Petitioner’s domestic violence.
Last, but not least, the court is greatly concerned about Petitioner’s admitted pattern of domestic violence. Perhaps the State Legislature in enacting chapter 85 of the Laws of 1996 put it best when it enunciated its policy in section 1. It states, in pertinent part, that:
"Studies indicate that children raised in a violent home experience shock, fear, and guilt and suffer anxiety, depression, somatic symptoms, low self-esteem, and developmental and socialization difficulties. Additionally, children raised by a violent parent face increased risk of abuse * * *
"A home environment of constant fear where physical or psychological violence is the means of control and the norm for the resolution of disputes must be contrary to the best interests of a child.” (L 1996, ch 85, § 1.)
This court is unpersuaded by Petitioner’s forthrightness in admitting his acts of domestic violence against the respondent and his former wife. He has neither given any assurances that such outbursts will not recur, nor has he shown that he has taken any affirmative steps to deal with his propensity toward violence. Based upon the facts before it, this court cannot find that it would be in the child’s best interest to place him in Petitioner’s care and custody.
Based upon the totality of the circumstances, specifically the existence of the prior custody arrangement, the relative fitness of the parties, the quality of each parent’s home environment, and the domestic violence exhibited by Petitioner in both of his marriages, it is the opinion of this court that it is in the best interest of the subject child for custody to remain with the Respondent Mother.
Accordingly, Petitioner’s petition is denied. Respondent’s petition for custody is granted.