Salvatore M. v Tara C. (2006 NY Slip Op 50515(U))

[*1]

Salvatore M. v Tara C.

2006 NY Slip Op 50515(U) [11 Misc 3d 1071(A)]

Decided on March 2, 2006

Family Court, Suffolk County

Simeone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 2, 2006

Family Court, Suffolk County
Salvatore M., Petitioner,
against
Tara C., Respondent.
V-11289-04/05 I

Ettore A. Simeone, J.
Petitioner filed application dated June, 18, 2004, seeking custody of the parties' child, Salvatore Jr., alleging that respondent, Tara C., has continually interfered with his relationship with the child and that he is capable of providing a loving and stable environment. Petitioner, also filed a petition dated June 28, 2004, seeking that respondent, be found in contempt for denial of visitation as set forth in the order of Hon. Carnell Foskey of Nassau County Family Court dated June 1, 2004. After lengthy trial proceedings, this Court by order dated March 16, 2005, found respondent in contempt for denying petitioner his Court ordered visitation, continued custody with respondent, and set forth a detailed schedule of visitation, with specific directives, so as to provide petitioner and the child with meaningful contact.
Subsequently, on April 28, 2005, petitioner filed another application alleging that respondent willfully violated the Court's order of March 16, 2005 by denying him his Court ordered visitation with the parties' child. The Court conducted a hearing on the petition and issued an order dated September 28, 2005, in which the Court stated that "as a result of respondent's blatant and repeated disregard for the orders of this Court, and the Nassau County Family Court, petitioner was denied meaningful contact with the parties child from February until June of 2005." The Court reserved disposition on that matter, pending a hearing on another application dated September 8, 2005, filed by petitioner, alleging further denial of visitation by respondent in contravention of the Court's Order of March of 2005. Petitioner thereafter, filed an amended petition dated November 11, 2005, alleging yet additional instances that respondent [*2]denied petitioner his Court ordered visitation. The Court conducted a hearing on the petitioner's application for custody of the parties' child and for a finding that respondent willfully violated the Order of March 16, 2005 on September 29, 2005, October 27, 2005, November 23, 2005, December 20, 2005, January 5, 2005 and February 1, 2005.
FACT-FINDING:
Petitioner testified that he has resided in the same house in Peekskill, New York, for over twenty years, where he lived with respondent and the child until respondent left with the child to move to Long Island when the child was six months old. Petitioner currently rents this 1,000 square foot ranch with his fiancé for $800.00 per month from a friend, "Paul S.", who bought it from petitioner in 2000, after petitioner allowed the house to go into foreclosure. Petitioner claims that other than his car payment and insurance payment, he is unable to make any other payments. Petitioner states that his fiancé pays the bills and that if he was unable to rely on her, he does not feel that his friend, Mr. S. would "put him out".
Petitioner testified, at the commencement of the hearing, that he was employed at a golf club as an "Assistant to the Pro" as of April 1, 2005 earning $12.00 per hour with an opportunity to become "Director of Outside Operations". Petitioner submitted pay stubs from the Anglebrook Golf Club, which indicated a gross income between $714.00 and $1,042.50 per week. All pay stubs included a "garnishment" with net pay ranging between $144.00 and $226.26. (Petitioner's Exhibit "1"). He also testified that he took the "PGA test" to get into a "PGA apprenticehship" and earned $1,000.00 for conducting a two hour clinic. He indicated that he intends on doing more clinics and that he works approximately 35-40 hours per week. Additionally, he states that his fiancé is thirty-six years old without children of her own and would help to take care of the child. Subsequently, during the pendency of the instant matter, petitioner became unemployed.
Petitioner admitted that he is in arrears in child support and that a money judgment was entered against him and in favor of the respondent for $8,134.00. Petitioner was found by the Support Magistrate to have willfully violated an order of support (Respondent's exhibit "B") and was sentenced to jail on August 3, 2005. While respondent spent a night in jail, he was released the following day after his fiancé' paid the purge amount of $4,250.00, as established by the Court.
 Petitioner is currently obligated to pay respondent $1,100.00 per month in accordance with the Support Magistrate's Order dated July 22, 2005 (Respondent's exhibit "B")with $900.00 to go toward child support and $200.00 toward the payment of arrears. Petitioner claims that he was never in arrears when the child support order was $400.00 per month, and that he was supposed to receive an offset of $6,300.00 for the period when he had custody of his son. While petitioner sought to have his child support reduced, the Support Magistrate dismissed respondent's petition for a downward modification by order dated October 29, 2004 (Respondent's exhibit "C"), finding that "petitioner's testimony that he is unemployed is not credible." Petitioner admits to owing $10,000.00 in child support.
Petitioner testified to the following series of instances in which respondent denied him Court ordered visitation: petitioner stated that on February 4, 2005, he went to pick up the child at respondent's residence and no one was home; petitioner testified that on February 18, 2005, he met with a police officer regarding his visitation, and was told by the police officer that [*3]respondent said to have petitioner come back on Sunday to pick up the child; petitioner stated that on March 4, 2005, he went to pick up the child and was refused visitation; petitioner stated that on March 6, 2005, respondent refused him visitation claiming that the child had religion class, but refused to provide petitioner with any information as to the class or the teacher; on March 24, 2005, respondent did not transport the child to petitioner's residence for spring recess in accordance with the Court's order of March 16, 2005; on April 8, 2005, respondent did not transport the child for petitioner's weekend visitation, claiming that she was unable to make the trip due to "car trouble"; on May 13, 2005, May 27, 2005, June 10, 2005, June 24, 2005, July 8, 2005, and July 22, 2005, respondent did not transport the child to petitioner's residence for his weekend visitation in accordance with the Court's order.
Further, petitioner testified that on August 1, 2005, when he arrived at respondent's Huntington Bay address to pick up the child for his month of summer visitation, he was told that respondent was evicted and no longer resided there. Petitioner stated that respondent never informed him as to a change of address. Thereafter, petitioner called the law guardian for the child and after a conference call was arranged with respondent, respondent claimed that her attorney was supposed to tell petitioner that they moved. Petitioner obtained respondent's new address in Oyster Bay and picked up the child for visitation.
Petitioner reported that prior to respondent's relocation to Oyster Bay, she lived with the child for approximately a year and a half in Huntington and before that they lived in Manhasset. Petitioner testified that in 2002, after respondent had a "big fight" with Mr. C., she moved out of the Manhasset residence and moved in with her grandmother and that petitioner obtained custody of the child for approximately ten months. Petitioner stated that during the time he had custody he took the child to therapy once a week and that the therapist wanted respondent to participate, but that she refused. Subsequently, respondent moved back to Manhasset with Mr. C. and regained custody of the child. Petitioner testified that respondent has also lived in an apartment in Hicksville with the child for less than a year and in a basement apartment in Bethpage.
Petitioner testified that during his summer visitation with his son in August, they played golf, went to a water park, a PGA event in New Jersey, went hiking, biking, played video games and went to Florida to see his parents and the child's grandparents. Petitioner also stated that he contacted respondent's father and met him in St. Petersburg and that they also spent time with other family as well.
Petitioner testified to following additional instances which occurred after his summer visitation, in which respondent denied him his Court ordered visitation: on September 9, 2005, respondent did not transport the child to his residence for his weekend visitation nor did she call or communicate with him until September 23, 2005, when she dropped the child off for visitation at 7:27 p.m., as opposed to 6:00 p.m. as provided in the Court's order; on October 7, 2005, he called the child at 5:00 p.m. in accordance with this Court's directives to allow phone contact and respondent told petitioner "it's your weekend and we're coming up", even though petitioner told her it was not his weekend; on October 14, 2005, respondent did not transport the child to petitioner for his weekend visitation; on October 21, 2005, petitioner tried to call the child and was again told by respondent that she was "bringing him up", even though petitioner told her he was working and that it was not his weekend. ; on October 28, 2005, respondent did not bring the [*4]child to petitioner's residence for visitation, despite the "in Court" directive made on October 27, 2005, that visitation was to occur on October 28, 2005. (The Court notes here, that since September 30, 2005 was a Friday, that there may have been some confusion as to whether the weekends of October 7, 2005, and October 21, 2005, are the second and fourth weekends of the month designated for petitioner's weekend visitation.)
Petitioner also testified as to numerous problems with his attempts to have telephone contact with the child in between visitation. Petitioner indicated that when he would call at 5:00 p.m. to talk to the child, in accordance with the time specified in Court for phone contact to occur, that respondent answered the phone and she would "want to talk about money". Petitioner recorded a conversation which took place on September 30, 2005, in which Mr. C. told him to "fuck off" when he asked to speak to the child. (Petitioner's exhibit "2"). Further, petitioner testified that he repeatedly got respondent's voice mail and was unable to speak with his son. In support of his testimony, petitioner submitted telephone records of Melissa B., which listed 48 calls made between September 28, 2005 and November 25, 2005 to respondent's cell phone that lasted less than thirty seconds , indicating petitioner's inability to speak with his child by phone (Petitioner's Exhibit "11").
Respondent admitted upon examination, that petitioner was entitled to telephone contact with the child every day, but stated that she would only answer her cell-phone if the number was not "blocked" so as to avoid wrong numbers and solicitors. Respondent claims that she has told petitioner not to block his number. Petitioner denied having any "block" on his phone or any phone that he uses to call the child.
Respondent also stated that petitioner does not always call at 5:00 p.m. and that when she did get messages from petitioner, she would ask Sal Jr. if he wanted to call petitioner back. She indicated that Sal Jr. called petitioner back on two or three occasions, but was unsure as to how many "successful" calls were made in which petitioner actually spoke with the child. On cross-examination, respondent stated that "more than half of the time" petitioner did get to speak with Sal Jr., and that generally their calls do not last for more than five minutes. Respondent added that if Sal Jr. wanted to call his father he could, but that he is not "a phone kid".
Petitioner further complained about the lack of information provided to him by respondent with respect to the child's education. Petitioner testified that he only recently learned from his son, on September 23, 2005, that he was attending St. Patrick's Catholic School in Huntington. Petitioner testified that thereafter, he spoke to the principal of the school who told him that she did not know he existed.
Petitioner submitted a "general registration form" for St. Patrick's, dated May 4, 2005, and completed by respondent, in which respondent indicated the child's last name to be "M.-C." and listed Joseph C. in the space provided for "father's name." (Petitioner's Exhibit "10"). Respondent pointed out that she modified the form to indicate "step" father before writing in Mr. C.'s name. While respondent admitted that she did not include petitioner's name on the registration form, she stated that she told petitioner in June or July of 2005, when they appeared before the Support Magistrate, that the child would be attending a new school.
Ms. Christine W., the child's fourth grade teacher at St. Patrick's testified that she met with the respondent in September of 2005, but at that time, was unaware of the father's existence. Ms. W. states that Sal Jr. goes for extra-help in writing and reading and that he does "o.k." in [*5]math and religion. She indicated that Sal Jr. has a problem completing his homework assignments and that last trimester he had four missing assignments. She stated that this trimester he had two missing assignments and when she spoke to him about this, he told her "it's crazy at my house" and that "my step-dad yells". When Ms. W. spoke to respondent about the situation, respondent told her that "his step-dad yells about work or about the dog and that bothers Sal Jr. because he is sensitive".
Respondent testified that she helps her son with his writing at home and that while she tries to get her son to do his homework, he forgets his books at times. Respondent submitted an
e-mail from Ms. W. dated January 12, 2006, which states that "Sal is doing really well. Since we came back from Christmas break he has been reading every afternoon while we are waiting to go home. He also has been participating more in class." (Respondent's Exhibit "F")
Ms. W. also indicated that she met with petitioner in December for the first time and told him of the homework problem as well and that petitioner gave her some of the child's prior school records. When Ms. W. told respondent that she spoke with petitioner, respondent told her that petitioner did not have the right to speak with the child's teachers. Respondent testified that she told the school that petitioner can go to parent-teacher conferences but that she would like to be informed.
Petitioner's fiancé Melissa B. testified that she became engaged to petitioner in December of 2005, and that they've been together for six years and living together for five and a half. Ms. B. stated that she pays the rent of $800.00 per month for the house that she shares with petitioner and most of the bills, but that they both pay for food and electric.
Ms. B. teaches aerobic classes and manages a fitness center. Additionally, she states that she has a nursing degree, a degree in early childhood education, and is a certified personal trainer. She testified that she has known Sal Jr. since he was four years old, that she is involved in activities with him and would love for him to live with them. When questioned by the Law Guardian, Ms. B. stated that on a rare occasion the child has called her "Mom" and that while she never asked him to do so, she does not correct him.
Ms. B. testified that on March 8, 2005, respondent's husband, Mr. C., called her at the fitness center where she works, asked her about her finances and "tried to get money out of her". Further, Ms. B. testified that Mr. C. said that "we're paying for this bastard child"; "he's not mine, I should not have to pay for him"; "should I throw him out in the street?"
Respondent, Tara C. testified that Sal Jr. is nine and a half years old that she has had custody of him since birth, with the exception of a nine month period in 2002. During that period she stated that she had visitation one day during the week and every other weekend until she regained custody on September 26, 2002. Respondent states that she also has a four year old daughter with her husband, Joseph C.. Respondent and Mr. C. have been married since 2002, and are expecting another child in September of 2006. Respondent describes Sal Jr.'s relationship with his half-sister as "good" and states that they watch television, swim, rollerskate, and do arts and crafts together. Both children attend St. Patrick's School in Huntington.
Currently, respondent states that she lives with her family in a four bedroom house in Oyster Bay that they rent for $2,800.00 per month and in which Sal Jr. has his own room. She testified that they moved from an apartment in Huntington Bay on August 1, 2005, that they rented for $4,000.00 per month. Respondent denied being evicted from the Huntington Bay [*6]home, and claims that they moved when their lease was up.
Respondent was questioned as to the status of Mr. C.'s businesses and certain bankruptcy proceedings filed, but testified that she was basically unaware of his financial situation other than the fact that he did file for bankruptcy. Respondent indicated that she is unemployed and that Mr. C. is the sole wage earner for their family. She stated that Mr. C. gives her money and that she has her own bank account from which she pays the bills and "is able to provide Sal Jr. with what he wants."
Respondent testified that she has a money judgement against petitioner for $8,100.00 representing unpaid child support and that he is in arrears of over $18,000.00. Additionally, respondent indicated that she petitioned the Court to hold petitioner in contempt for failure to pay child support and that in the summer of 2005, petitioner was sentenced to jail by Judge Spinner in Family Court. Respondent indicates that since December of 2005, she has started to receive support checks from petitioner's unemployment. Respondent also indicated that all the child support that she owed petitioner for the period of time in 2002 that he had custody, has been paid in full.
Respondent admitted that Judge Foskey of the Nassau County Family Court admonished her with regard to the violation of Court orders; and that she was held in contempt by this Court on two separate occasions for the denial of visitation. She further recognized that the Court issued a modified visitation order in March of 2005, which directed her to drive the child to petitioner's home for visitation. Respondent claims that she drove the child to petitioner's home for visitation but "not all the time" and "does not know" how many times petitioner failed to receive his visitation. Additionally respondent stated that she did not drive the child to petitioner's house for visitation because she was not receiving child support.
Respondent also attempted to explain her failure to transport the child to visitation was due in part to "car trouble". Respondent stated that she owns a 1999 Nissan Altima with 98,000 miles on it and that during the second weekend of December it "broke down". She testified that she had problems with "the alternator" and that the car was "hit" and was basically unreliable to transport the child to visitation on certain occasions. Respondent indicated that this is the only car that the family owns and that her husband does not drive, but that she drives him to the train station for work. Respondent claimed to be unaware of whether her husband has a driver's license, but upon further questioning admitted that "as far as I know he doesn't".
Respondent testified to an incident which occurred during petitioner's weekend visitation of November 11, 2005. Respondent stated that when petitioner returned the child home "curbside", after visitation on November 13, 2005, that the child's face was swollen with a bruise in the middle of his forehead and a cut near his nose under his left eye. When respondent called to speak to petitioner about this, petitioner said that "the child ran into an "R.V." and told her that he did not take the child to the doctor or the hospital. Respondent indicated that petitioner further told her "you take him to the doctor, you have custody".
Respondent stated that she cleaned the cut on the child's face, put ice on his forehead and kept a close eye on him. The next day, on November 14, 2005, she took the child to the pediatrician and was given an "antibiotic cream" to apply to the cut. That evening, respondent reported that the child was up in the middle of the night, nauseous and confused and so she took him to the emergency room on November 15, 2005 where he was treated. Respondent claims [*7]that as a result of the incident the child has a "permanent scar" on his face.
Petitioner testified that the child hit his face when he ran into the "R.V. Mobile Home" in his driveway and that he saw him do it. Petitioner indicated that the child cried but did not lose consciousness, that he put ice on it, after which Sal Jr. said he was "fine". Petitioner added that there was no bleeding and that after the incident they went hiking and skating and the child did not experience any further problems. Petitioner claimed that it was an abrasion which appeared as a "little triangle" on the child's face the following day. Ms. B. concurred with petitioner's testimony that they applied ice and the child said he was "o.k." and that they checked it before they went hiking and that evening as well.
Petitioner testified that after he dropped the child back home from visitation on November 13, 2005, that respondent called his cell phone screaming and yelling that "I am going to take him to the doctor and tell you how much your half is." Petitioner indicated that subsequently, his attorney told him that the child had sustained a "slight concussion".
The Law Guardian submitted photographs of the child standing in the kitchen of petitioner's home before the incident, with no visible marks of his face (Law Guardian's Exhibit "4"), and of the child skating after the incident, in which a small abrasion appears on the left side of his face, directly next to his nose. (Law Guardian's Exhibit "3" and "5"). These photographs do not depict the child's forehead because he is wearing a baseball cap.
Respondent's husband, Mr. Joseph C. testified that he is married to respondent and has lived with her and Salvatore Jr. in Hicksville, Manhasset, Huntington Bay and Oyster Bay. He stated that he helps take care of Salvatore Jr., and has helped him with his homework on occasion. He indicated that he has never hit the child and does not yell at him excessively, but admits to "raising his voice" for the purposes of discipline.
Mr. C. testified that he did not recall being evicted from the Huntington Bay residence where he lived with respondent and the child, however petitioner introduced a "Warrant of Eviction" dated April 5, 2005, issued against respondent and Mr. C. in relationship to their Huntington Bay address (Petitioner's Exhibit "5"). Mr. C. claimed that they voluntarily left the premises after the lease was up in July of 2005.
Mr. C. further testified that he owns and operates several businesses, but does not recall what he earned in 2004 or 2005 and would have to ask the accountant who takes care of his business finances. He stated that he is currently "in bankruptcy" for his business "Victory Environmental Services".
Mr. C. attempted to explain respondent's failure to transport Sal Jr. for visitation with petitioner. Mr. C. claimed that respondent's car broke down and that when she did drive the child, petitioner told her that it was not his weekend. Mr. C. stated that the Nissan Altima that respondent drives needed an alternator recently, but is currently in "workable" condition. Further, Mr. C. also claimed that petitioner agreed to drive the child if there was "no interference", but that generally "he didn't show". Mr. C. indicated that on an occasion when petitioner did come to pick up the child, he showed up at 5:30 p.m. and told respondent that he was "doing her a favor". Mr. C. testified that he does not drive and that his license was suspended due to a "D.W.I", but that he "has not been convicted of a D.W.I" and that it is "going to trial".
Mr. C. was very vague with regard to questions involving his finances or any personal criminal history, but when questioned about a "disorderly conduct", he did state that "it had [*8]nothing to do with children" and that it was "a business matter". Mr. C. indicated that petitioner had him arrested for alleged "threatening phone calls" he had made, but denies ever doing so or ever speaking to petitioner or petitioner's fiancé on the telephone.
The Court conducted an "in-camera" interview of the child. The Court found Sal Jr. to be a sensitive, delightful and well mannered child who seemed to be experiencing a certain degree of anxiety surrounding his parents constant discord and the underlying proceeding to determine custody. While not determinative, the Court takes into consideration the child's statements.
LEGAL ANALYSIS:
Mr. Salvatore M. as the petitioning party seeking a change of custody, must show a change in circumstances reflecting a real need for change in order to insure the continued best interest of the child. Bowe v. Robinson, 23 AD3d 555, 805 NYS2d 91 (2d Dept. 2005). See Eschbach v. Eschbach, 56 NY2d 167, 451 NYS2d 658 (1982); see also Carnrike v. Kasson, 291 AD2d 680 (3d Dept. 2002); Fox v. Fox, 177 AD2d 209 (4th Dept. 1992)). The Court may require a change in custody if the totality of the circumstances warrants a modification and such a change is in the best interests of the child. Bowe v. Robinson, 23 AD3d at 556, 805 NYS2d at 93. In determining the best interest of the child where a change of custody is sought, the court considers such factors as the original placement of the child, the length of that placement, relative fitness of parents, quality of home environment, parental guidance given to the child, parents' financial status, and parents' ability to provide for the child's emotional and intellectual development. Matter of Bowe v. Robinson, 23 AD3d 555, 805 NYS2d 91 (2d Dept. 2005) ; Matter of Lobo v. Muttee, 196 AD2d 585, 587, 601 NYS2d 322, 324 (2d Dept. 1993); Dr. Santoro v. Dr. Santoro, 638 NYS2d 4789 (2d Dept. 1996)); Eschbach v. Eschbach, 56 NY2d 167, 451 NYS2d 658 (1982); Kresbach v. Gallagher, 181 AD2d 363, 587 NYS2d 346 (2d Dept. 1992); Matter of Peter M. V. Joanne N., 190 AD2d 798, 593 NYS2d 560, 561 (2d Dept. 1993).
The Court has duly considered all factors relevant to petitioner's application for custody and determines that it is in the child's best interest that the order of March 16, 2005, be modified and that custody of the parties' child, Salvatore M., Jr., be awarded to petitioner. In order to reach its' determination, the Court considered the relevant legal factors, the credibility of the witnesses, the recommendation of the Law Guardian and the importance and necessity for the child to have a meaningful relationship with both parents.
Stability is indeed an important consideration in assessing the best interests of the child where a change of custody is being sought and while respondent has had custody of the child for most of his life, she has lived in at least four different locations, in a relatively short period of time. Most recently respondent moved with her family from Huntington Bay to Manhasset after a warrant of eviction was issued.
On the other hand, petitioner has resided in the same house in Peekskill, New York, for over twenty years, where he lived with respondent and the child before she left with the child to move to Long Island when the child was six months of age.
 Neither party in the instant case was able to establish a reasonable degree of financial stability. Petitioner, while employed at the commencement of the hearing, has recently lost his position as a "Golf-Pro" and relies on his fiancé for financial support. Respondent is also unemployed and relies on her husband for financial support. The Court can certainly appreciate the benefit to the child of having his mother available for his care, however, respondent's [*9]husband, Mr. C., was extremely evasive as to his financial circumstances, leaving the Court with no basis to assess respondent's financial situation.
The Court also had the opportunity to assess Mr. C., respondent's husband, and Ms. B., petitioner's fiancé. Undeniably, both individuals will have an impact upon the child by virtue of their constant exposure and interaction. The Court found Ms. B. to be credible and sincere. Ms. B. presented herself as a responsible, caring and kind individual who exhibits great care and concern for petitioner and Salvatore Jr. The Court believes that Ms. B. will continue to provide a stable, loving and nuturing influence in the child's life.
Mr. C.'s testimony however, was wrought with evasiveness, lacking credibility or sincerity. The Court is concerned with Mr. C.'s inability to control his anger and the effect that it has on the child. Ms. W., the child's fourth grade teacher testified to the fear and anxiety as expressed by the child in school. The Court finds respondent's explanation that her husband merely "yells about work" or the dog", less than convincing. Further, respondent's contention that these outbursts of anger "bother Sal because he is sensitive", shows a complete lack of insight into the emotional needs of her son. The Court notes that petitioner, while only having custody of his son for a ten month period in 2002, did obtain counseling for the child on a weekly basis in an effort to provide for the child's emotional well-being; and while respondent was asked to participate, she refused. Respondent did not produce any evidence as to the provision of counseling for her son or the desire to obtain such counseling in the future.
 Most notable in this case and weighing heavily in favor of a modification of custody is the respondent's repeated denial of petitioner's right to visitation in violation of this Court's order. "Interference with the relationship between a child and a non-custodial parent by the custodial parent has been said to be an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent." (In the Matter of Carl J.B. v. Dorothy T., 186 AD2d 736, 589 NYS2d 53 (2d Dept. 1992)); Hamersky v. Hamersky, 290 AD2d 414, 736 NY2d 603 (2d Dept. 2002); see also Bobinski v. Bobinski, 9 AD3d 441, 780 NYS2d 185 (2d Dept. 2004).
The Court finds herein, for the third consecutive time, that respondent has failed to provide petitioner with visitation in accordance with the terms and conditions of the Order of the Court. Even without consideration as to the confusion with regard to the weekend visitation dates in October of 2005, petitioner was denied visitation by respondent on a continual and repeated basis. Respondent admits that she has failed to transport the child in accordance with this Court's Order of March of 2005 on more than one occasion offering various excuses such as "car trouble", petitioner's failure to pay support or confusion as to the designated weekends for visitation. On numerous occasions, respondent failed to make the child available for petitioner, when petitioner was picking up the child. On one occasion, petitioner arrived at respondent's home to pick up the child, only to find out she and the child had moved. Petitioner established that respondent failed to answer forty-eight phone calls, between September 28, 2005, and November 25, 2005, that he made to respondent's cell phone in attempt to engage in telephone contact with the child.
 When the Court issued its' order in March of 2005, it specifically fashioned terms in an effort to compel respondent to comply with conditions of visitation. Despite the Court's admonishments and directives, respondent's repeated and blatant disregard for the Court's order, [*10]continues to deprive the child from meaningful contact with petitioner. "To be meaningful, visitation must be frequent and regular". See Daghir v. Daghir, 82 AD2d 191, 441 NYS2d 494 (2d Dept. 1981). Even more remarkable, is that respondent not only asks to retain custody, but also seeks to be relieved of her obligation to transport the child to petitioner's home in accordance with the Court's order. The Court finds that respondent's repeated failure to provide petitioner with his visitation, despite admonishments and contempt findings by the Court, renders her unfit to continue as the custodial parent.
The Court concurs with the Law Guardian's recommendation that petitioner be awarded custody. In so doing, it must be noted that the Court's decision to modify custody is not being made to punish respondent for her contemptuous acts, but on a finding that such modification, based on the totality of circumstances, is in the child's best interests. The Court finds that petitioner is more capable of providing a stable and loving environment, as well as more responsive and sensitive to the child's emotional needs. The Court determines that respondent is incapable of continuing to act as the custodial parent by her constant interference with petitioner's attempts to engage in a meaningful relationship with his son, in contravention of the child's best interests. "It is firmly established...that...wherever possible, the best interests of a child lie in his being nurtured and guided by both of his natural parents." Daghir v. Daghir, 92 AD2d 191, 193, 441 NYS2d 494 (2d Dept. 1981). Respondent has made it clear, through her acts of interference, that she is incapable of fostering any meaningful relationship between petitioner and the child thereby depriving the child of the benefit of the nurturing and guidance of a biological parent. Petitioner is the far more likely of the two "to assure meaningful contact between the child and the non-custodial parent." See, In the Matter of Green v. Gordon, 7 AD3d 528, 529, 776 NYS2d 73, 74 (2d Dept. 2004). It must be noted that the Court recognizes that separation of siblings is disfavored, see, Eschbach v. Eschbach, supra . at 173; Salerno v. Salerno, 273 AD2d 818 (4th Dept. 2000), and in no way means to minimize the child's relationship with his four year old half-sister; however, the overwhelming evidence dictates that the child's best interests would not be served if the Court permitted this factor to control.
Accordingly, the Court finds, for the third consecutive time, respondent to be in contempt for failure to abide by the terms and conditions of the Order of the Court, by denying petitioner visitation on a continual and repeated basis. The Court determines that the totality of the circumstances dictate that custody be modified and awarded to petitioner. The Court directs that the transfer of custody from respondent to petitioner is to occur on August 1, 2006, after the conclusion of the 2005-2006 school year, so as not to interrupt the child's education and to permit a period of summer visitation for respondent and the child. Additionally, petitioner is hereby directed to obtain and participate in counseling for the child, in furtherance of the child's best interests and is to make respondent aware of the counseling engaged in, so as to provide her the opportunity to participate as well. While somewhat doubtful of the parties' ability to agree upon a schedule of visitation for respondent and the child, the Court will permit the parties an opportunity to do so by April 15, 2006. Should the parties fail to do so, the Court will provide an appropriate schedule which will include regular visitation between respondent and the child so that respondent may maintain meaningful and regular contact with her son, Salvatore, Jr.
In addition to the resolution of petitioner's application to modify the prior custody order, this decision shall constitute the Court's determination of the disposition of the petitioner's [*11]contempt applications.
This constitutes the final order of the Court.
ENTER
 
 HON. ETTORE SIMEONE
 J.F.C.
Dated: March 2, 2006
cc: Petitioner
Respondent
Richard M. Gold, Esq.
Steven P. Flamenhauft, Esq.
Janis M. Noto, Esq.