Order, Supreme Court, New York County (Ann E. O’Shea, J.), entered November 9, 2012, which, after a nonjury trial, inter alia, awarded plaintiff mother sole physical and legal custody of the children Tallulah and Scarlet, and allowed the child Fascal to continue to live with defendant father, with the parties having joint decision-making authority with respect to Fascal’s education and serious medical care, provided that plaintiff would have final decision-making authority in the event of a conflict or defendant’s failure or refusal to communicate with plaintiff, and granted plaintiff the authority to change the children’s therapists, unanimously modified, on the law and the facts and in the exercise of discretion, to vacate the award of custody of Scarlet to plaintiff and to award sole legal and physical custody of Scarlet to defendant, and to remand the matter to Supreme Court for the determination of appropriate visitation rights, and to vacate the grant of authority to plaintiff to change the children’s therapists and final decision-making authority with respect to Fascal’s education and serious medical needs, and to award sole legal and physical custody of Pascal to defendant, and otherwise affirmed, without costs.
The parties were married on July 25, 1990 and have three children, Pascal, Scarlet and Tallulah. On October 23, 2010, the mother left the marital home in Manhattan to move in with her lover on Long Island, taking Tallulah with her. Pascal and Scarlet continued to live with the father in Manhattan, and have expressed a very strong preference to remain in his custody, a position, we note, supported by the court-appointed neutral forensic evaluator and advocated by the attorney for Pascal and Scarlet.
“It is axiomatic that in considering issues of child custody, a court must determine what is in the best interests of the child, and what will promote the child’s welfare and happiness” (Mat *408 ter of James Joseph M. v Rosana R., 32 AD3d 725, 726 [1st Dept 2006], lv denied 7 NY3d 717 [2006]). Factors to be considered include “the existing custody arrangement, the current home environment, the financial status of the parties, the ability of each parent to provide for the child’s emotional and intellectual development and the wishes of the child” (Matter of Marino v Marino, 90 AD3d 1694, 1695 [4th Dept 2011]; see also Eschbach v Eschbach, 56 NY2d 167, 171 [1982]). The court is obligated to examine the totality of circumstances, and “the existence or absence of any one factor cannot be determinative” (Eschbach, 56 NY2d at 174). However, although “the express wishes of [the] child[ ] are not controlling, they are entitled to great weight, particularly where [the child’s] age and maturity would make [his or her] input particularly meaningful” (Matter of Stevenson v Stevenson, 70 AD3d 1515, 1516 [4th Dept 2010] [internal quotation marks omitted], lv denied 14 NY3d 712 [2010]).
When viewed in light of these principles, the court’s finding that the best interests of Scarlet would be served by immediately awarding sole legal and physical custody to her mother, and that Scarlet be forbidden from having any contact with her brother and father for six weeks after the transfer of custody, lacks a sound and substantial basis in the record. It would not be in the best interests of Scarlet, now 14, to disrupt her life by removing her, against her wishes, from her father and brother in Manhattan, where she has always lived, and placing her with her mother and her mother’s lover, a situation that she is not comfortable with, on Long Island, in a community that she does not know.
Indeed, the court recognized that such a change of custody would be seriously distressing and disruptive to Scarlet and “may well make Scarlet very angry and cause her significant emotional upset, even turmoil in the short-term.” In the absence of any expert testimony, the court’s conclusion that this turmoil “will be temporary and far less emotionally destructive than abandoning her to an unfit parent, which may well leave her with permanent emotional scars,” is speculative, as is the court’s finding that “Scarlet still has a strong, albeit hidden, bond with her mother.”*
In disregarding Scarlet’s wishes and the importance of maintaining stability in her life, the court erred by placing undue emphasis on a single factor, the father’s alleged alien *409 ation of Pascal and Scarlet, and erroneously found that Pascal and Scarlet are “vindictive, cruel, angry, and broken children,” whose “expressed wishes . . . are the product of Defendant’s poisonous efforts to alienate them from their mother.”
A custodial parent’s conduct may warrant a change of custody if it reaches “the level of deliberately frustrating, denying or interfering with” the parental rights of the noncustodial parent so as to raise doubts about the custodial parent’s fitness (see Matter of Lawrence C. v Anthea P., 79 AD3d 577, 579 [1st Dept 2010]). However, even egregious conduct in this regard must be viewed within the context of the child’s best interests (see Matter of Lew v Sobel, 46 AD3d 893, 895 [2d Dept 2007] [“While one parent’s alienation of a child from the other parent is an act inconsistent with the best interests of the child, here, the children’s bond to the alienating parent is so strong that a change of custody would be harmful to the children without extraordinary efforts by both parents and extensive therapeutic, psychological intervention” (citation omitted)]; Matter of Charpentier v Rossman, 264 AD2d 393 [2d Dept 1999] [father properly awarded sole custody, notwithstanding his interference with relationship between mother and child, based on strong preference for father expressed by 17-year-old child]). Although we agree with the trial court that the father should have been more restrained in the comments he made about the mother in the presence of Pascal and Scarlet, his conduct in this case does not rise to the level of deliberately frustrating, denying or interfering with the parental rights of the mother so as to raise doubts about his custodial fitness.
Significantly, in performing its analysis, the court failed to give sufficient weight to the mother’s role in the alienation of Pascal and Scarlet’s affections, as well as her inability to accept any responsibility for the deterioration of her relationship with them (see Matter of Muzzi v Muzzi, 189 AD2d 1022, 1024 [3d Dept 1993] [it was inappropriate for Family Court to favor one party’s contentions where neither party blameless]). The record demonstrates that while the mother was still married and living in the marital home, she confided to Pascal that she had rented a home with her lover on Long Island, and encouraged Pascal to keep it a secret, inappropriately placing him in the middle of the marital difficulties she had with the father. The mother also invited her lover to the marital home to meet Pascal, against his express wishes. When Scarlet asked the mother if she was going to move out, the mother falsely assured her that she would not be leaving.
The court found that although the mother “may have *410 exercised poor judgment,” the children’s rejection of the mother “cannot be attributed to those lapses in judgment.” However, the record demonstrates that those actions contributed to Scarlet and Pascal’s feelings of abandonment and anger, and were a significant factor in undermining their relationship with the mother. For example, the supervisor of therapeutic visitation acknowledged that when visitation began the children’s “affect was one of great sadness and resentment and rejection of their mother based on the fact that she left them in the manner that she did,” and that on occasion Scarlet would cry throughout the visit.
The court also failed to give any weight to the fact that during the course of visitation, the mother continued to engage in conduct that undermined Scarlet and Pascal’s trust. For example, the mother assured Scarlet that she could continue to live with the father, while simultaneously seeking sole custody, and she used a visit that Pascal and Scarlet had with their sister Tallulah to secretly record their conversations. When Scarlet and Pascal discussed their feelings with the mother in therapy, the mother discounted those sentiments as the result of their father’s brainwashing, which, as counsel for Tallulah recognizes, “had to frustrate the older children and would make it reasonable for Scarlet to believe she wasn’t being heard.” In addition, the supervisor of therapeutic visitation testified that there were occasions when the mother made negative statements about the father, to which Pascal and Scarlet responded in a hurt manner.
Although there were occasional problems with visitation, the record does not support a finding that “the [father] intentionally interfered with visitation or that [his] conduct rose to such a level that [he] should be deprived of custody” (Matter of Krebsbach v Gallagher, 181 AD2d 363, 366 [2d Dept 1992], lv denied 81 NY2d 701 [1992]). The children attended 30 supervised visits with the mother, and the therapeutic visitation supervisor acknowledged that Pascal and Scarlet were not anxious to see her, and the father had to work very hard to get them to attend. While the children were occasionally late, the record supports the conclusion that this was due, at least in part, to their reluctance to engage with the mother, whose conduct, as set forth above, also contributed to the problems surrounding visitation (see Skolnick v Skolnick, 142 AD2d 570 [2d Dept 1988]). While the visits were suspended at times, that was, at least in part, because the father, who was ordered to pay 80% of the cost, had financial difficulties, and the supervisor refused to provide further services in the absence of payment.
*411 Furthermore, the court-appointed neutral forensic evaluator, the only disinterested witness who interviewed both parents and the children, testified that there was no evidence that either Scarlet or Pascal had been subject to parental alienation, and the court improvidently disregarded her testimony and placed undue emphasis on the testimony of the mother’s expert, who, unlike the court-appointed neutral evaluator, did not interview both parents and the children (see Matter of Chebuske v Burnhard-Vogt, 284 AD2d 456, 457-458 [2d Dept 2001]).
Insofar as the court found that the mother was virtually the exclusive caregiver for the children, we note that Pascal and Scarlet are now mature teenagers who have lived with the father since October 2010. They have a very strong relationship, and the continuity and stability of the existing custody arrangement weighs in favor of the father. We have considered the mother’s remaining arguments and find them unavailing.
Accordingly, sole legal and physical custody of Scarlet should be awarded to the father. The mother should be granted meaningful interaction and regular visitation, and we remand for a determination as to appropriate visitation. For the same reasons, we vacate the court’s award to the mother of final decision-making authority with respect to the selection of the children’s therapist and medical and educational issues relating to Pascal, now 17, and award the father sole legal and physical custody of Pascal. Sole legal and physical custody of Tallulah shall remain with the mother.
Lastly, we caution the father to consider the effects of his comments to the children, to refrain from any interference with the children’s relationship with the mother, and to do all that is within his power to encourage and support their relationship with her.
Concur—Tom, J.P., Friedman, Acosta, Andrias and Richter, JJ.

 As discussed below, we do not agree with the trial court’s determination that the father’s alleged parental interference was so egregious as to render him an “unfit parent.”